**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert ROSS, Defendant–Appellant.**

No. 00–6453.

United States Court of Appeals,
Sixth Circuit.

July 9, 2002.

Before KEITH and DAUGHTREY, Circuit Judges; MARBLEY, District Judge.*

## OPINION

MARBLEY, District Court Judge.

Defendant–Appellant, Robert Ross, was convicted of knowingly and intentionally attempting to manufacture at least five but less than fifty grams of methamphetamine or at least fifty but less than 500 grams of a mixture containing methamphetamine. On appeal, Ross challenges his conviction on several grounds, including: (1) the district court's denial of the Defendant's motion to suppress evidence seized during two searches of the Defendant's apartment; (2) the district court's failure to dismiss the superseding indictment as vague and overbroad; (3) the district court's ruling granting the Government's oral motion to delete certain words from the superseding indictment; and (4) the lack of sufficient evidence to support the jury's verdict. The district court properly exercised jurisdiction over this matter pursuant to 18 U.S.C. § 3231. This Court's appellate jurisdiction is proper pursuant to 28 U.S.C. § 1291.

For the reasons discussed below, the Court **AFFIRMS** Defendant–Appellant's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 1997, Defendant–Appellant, Robert Ross, then a chemistry major at Berea College, entered into a one-year lease to rent an apartment at Shannon Wood Manor in Berea, Kentucky. The lease provided that $350 in rent was due on the first day of each month. The lease agreement further indicated that:

> [t]he Lessee agrees to vacate the premises without demand and without notice whenever any of the following occur [sic]:
>
> (a) Any installment of rent is due and unpaid for more than three days after same is due;
>
> (b) The premises are used for any other purpose than as a residence for the Lessee;
>
> (c) Said premises are used for illegal purposes;
>
> (d) Occupants of said premises become a public nuisance;
>
> (e) The Lease is ended.

When the lease expired, Ross and his landlord, Kenneth Riley, did not renew it, but Riley agreed to continue to rent the apartment to Ross on a month-to-month basis. At trial, Riley testified that, because Ross was on financial aid, he allowed Ross to pay his rent in lump sums when his financial aid checks came in. Riley also testified, however, that Ross would contact him when he knew that he would be late with the rent and that Ross was never more than "just over a month past due." On November 2, 1998, Ross paid $1,400 in rent for October, November, December, and January; likewise, on March 5, 1999, Ross paid $1,400 in rent for February, March, April and May. Ross made no further rent payments to Riley after March 5, 1999.

On July 13, 1999, Ross left his apartment to stay with his terminally ill mother

---

* The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

in Henderson, Kentucky. Before he left, Ross neither told Riley that he was leaving but was planning on returning, nor did he make arrangements to pay his rent while he was gone. After some time passed, Riley began to look for Ross, occasionally stopping by his apartment and asking a few neighbors whether they had seen him. On August 10, 1999, still not having heard from or seen Ross, Riley sent a letter to Ross inquiring about the rent, which, at that point, was three months past due. Riley never received a response to the letter.[1]

By September 1999, Ross had not been in his apartment for over a month and a half and was four months behind in his rent payments. During that time, Riley grew increasingly concerned about Ross and the apartment. On September 10, 1999, concerned that something was wrong, Riley asked his friend, Mike Coyle, a Kentucky State Trooper, to go into Ross's apartment with him. When Riley opened the door, he and Coyle were greeted by a horrible smell.[2] The electricity had been disconnected and the apartment was in disarray. Riley and Coyle observed beakers, hotplates, vials covered with residue, and canisters of chemicals, as well as clothing, books, furniture, computers, and other personal effects throughout the apartment. Riley and Coyle stayed in the apartment five to ten minutes. Suspecting that some illegal drug activities had taken place in the apartment, Coyle asked Riley for Ross's full name and social security number, and instructed Riley to stay away from the apartment until further notice.

After he had been in the apartment with Coyle, Riley called and left a message for Ross at his mother's home. Ross returned Riley's phone call the next morning, September 11, 1999, and agreed to send Riley $1,400 for past due rent. During their conversation, Ross informed Riley that he had gone home to see his ill mother, who had since passed away. Ross did not indicate, however, whether he intended to return to his apartment, nor did Riley inform Ross that he and Coyle had been in the apartment. Riley never received the rent payment that Ross had indicated he was going to send.

On September 15, 1999, Berea Police Detective Jerry Combs contacted Riley, and Riley let him into the apartment. Combs searched the apartment for approximately three to six minutes. During the course of his search, Combs took a sample of a white substance that was on a counter top, which tested positive for cocaine. On September 16, 1999, Combs secured a search warrant, and agents from the Drug Enforcement Administration ("DEA") searched the apartment. The agents recovered materials and equipment used in the manufacture of methamphetamine, including hydrochloric acid, phenylacetic acid, formaldehyde, benzene, HEET, acetone, denatured alcohol, muriatic acid, red phosphorus, digital scales, and an acetylene torch. The agents also found several beakers and other pieces of glassware containing methamphetamine residue and substances in various stages of methamphetamine production. Ross's fingerprints were found on at least one piece of glassware. The agents also discovered various books and papers explaining different methods of manufacturing methamphetamine, receipts for precursor chemicals, and a letter from BDI Pharmaceuticals

1. Ross claims that he never received the August 10, 1999 letter.

2. Apparently, the smell was coming, in part, from food that had rotted in the refrigerator

after the electricity was turned off. Riley also testified that the apartment had a strong chemical smell.

addressed to Ross stating that he needed to register to buy ephedrine, a precursor chemical.

In early October 1999, Ross rented a truck and went to his apartment to pick up his belongings. When he arrived, he found that his apartment had been cleared out. A neighbor told him that DEA agents had taken everything from the apartment, so Ross left and returned to his mother's home.

On February 3, 2000, a federal grand jury indicted Ross on a single count of knowingly and intentionally attempting to manufacture more than 500 grams of a mixture or substance containing methamphetamine. On February 29, 2000, Ross was arrested on state charges in Henderson, Kentucky. Upon his arrest, Kentucky State Police learned of the outstanding federal warrant, which was served on that same day. On March 1, 2000, Ross signed a waiver of extradition, and on March 13, 2000, he was taken into federal custody.

On May 4, 2000, a federal grand jury returned a superseding indictment that charged Ross with knowingly and intentionally manufacturing with intent to distribute in excess of fifty grams of methamphetamine or 500 grams of a mixture containing methamphetamine (Count One); knowingly and intentionally possessing with intent to distribute in excess of fifty grams of methamphetamine or 500 grams of a mixture containing methamphetamine (Count Two); and knowingly and intentionally attempting to manufacture with intent to distribute in excess of 500 grams of a mixture or substance containing methamphetamine (Count Three).

Before trial, Ross filed motions to dismiss the superseding indictment as overly broad and vague, to suppress evidence, and to invalidate the search warrant. On July 13, 2000, the district court denied each of those motions. With respect to Ross's Fourth Amendment claim, the district court determined:

> The fact that defendant left his clothes, books, and other belongings in the apartment evidences defendant's intent to return to the apartment and his subjective expectation of privacy in the apartment. However, the testimony demonstrates that defendant's expectation of privacy is unreasonable under these circumstances. Defendant essentially abandoned the apartment for over two months. Defendant failed to notify Riley that he was leaving or that he planned to return. He failed to pay rent for four months or to provide an explanation to Riley for his failure to pay rent. In addition, defendant allowed the electricity to be disconnected and food to rot in the refrigerator. The Court finds that defendant had no legitimate expectation of privacy in the apartment and, therefore, does not have standing to contest the search of it.

On July 17, 2000, the first day of trial, the government orally moved to strike the language "with intent to distribute" from Counts One and Three of the superseding indictment as mere surplusage, arguing that a charge to manufacture a controlled substance does not require intent to distribute. The district court granted the government's motion on July 19, 2000.

At trial, in addition to the evidence found in the searches of Ross's apartment, the government offered the testimony of Michael Larue, who stated that he and Ross's brother went to Ross's apartment in Berea twice to get methamphetamine and LSD. Larue also testified that he had conversations "all the time" with the Defendant about how to manufacture methamphetamine. In his defense, Ross presented the testimony of Brian Gardner, a student at Berea College, who stated that

he and his girlfriend "house sat" for Ross after Ross left in July 2000.

At the close of the Government's case-in-chief, Ross moved for judgment of acquittal based on insufficient evidence. The district court denied that motion, and on July 19, 2000, the jury found Ross guilty of attempting to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1). The jury found Ross not guilty on Counts One and Two of the superseding indictment. On October 20, 2000, Ross was sentenced to 120 months imprisonment and eight years of supervised release.

## II. DISCUSSION

### A. Motion to Suppress

■ Ross's primary argument on appeal is that the evidence found in his apartment should have been suppressed because the two searches that occurred before a warrant was secured violated his rights under the Fourth Amendment. In particular, he contends that, under principles of Kentucky's property law, he had not abandoned his apartment at the time of the warrantless searches, and, therefore, he retained a reasonable expectation of privacy in the apartment. The district court rejected this argument, holding that although Ross demonstrated a subjective expectation of privacy in his apartment, he failed to show that this expectation was objectively reasonable in light of the fact that he had not lived in his apartment for two months and had failed to pay rent for four months. This Court finds that the district court's determination was correct.

In reviewing the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo. See United States v. McRae*, 156 F.3d 708, 711 (6th Cir.1998) (citation omitted). "Fourth Amendment jurisprudence is now well-set-tled that protections from unreasonable searches and seizures do not depend 'upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'" *United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir.1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (internal citation omitted)). As the Supreme Court has made explicit, a "legitimate expectation of privacy" has two components:

> The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,'—whether, in the words of the *Katz* [*v. U.S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] majority, the individual has shown that 'he seeks to preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable," '—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances.

*Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (citations omitted); *see United States v. King*, 227 F.3d 732, 743 (6th Cir.2000) (explaining that the determination of whether a legitimate expectation of privacy exists involves a two-part inquiry, based on both the defendant's subjective expectation of privacy and whether that expectation is objectively reasonable) (citation omitted). In this case, the district court properly determined that Ross had a subjective expectation of privacy in his apartment. Ross left his personal belongings in the apartment and returned several months later with a moving truck to pick them up, fully expecting that they would still be there. In addition, when Riley got in touch with

Ross by telephone, Ross assured Riley that he would pay the rent that was due.

Given that Ross evinced a subjective expectation of privacy, the question is whether this expectation is "one that society is prepared to recognize as 'reasonable.'" *Smith*, 442 U.S. at 740 (citation omitted); *King*, 227 F.3d at 743 (citation omitted). Although property concepts are not necessarily determinative of Fourth Amendment rights, *see Rakas*, 439 U.S. at 143, they are nonetheless helpful in assessing which expectations society is prepared to recognize as legitimate. *See id.* at 143 n. 12. In particular, a tenant's expectation of privacy in his apartment ceases to be "objectively justifiable" when his occupancy ceases to be lawful, as determined by the terms of his lease and the provisions of his state's landlord-tenant law. *See McRae*, 156 F.3d at 711 (noting that "important factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched," and holding that the defendant lacked a reasonable expectation of privacy in a vacant house that he neither owned nor rented) (citations omitted); *see also United States v. Allen*, 106 F.3d 695, 698–99 (6th Cir.1997) (recognizing that a defendant who failed to remain current on his rental payments lacked a legitimate expectation of privacy in his hotel room).

In the matter *sub judice*, provisions of Ross's lease, properly construed in light of Kentucky law, indicate that Ross's expectation of privacy at the time of the searches was not objectively reasonable. Ross's lease expired on August 31, 1998, yet he remained in his apartment until July 1999. Thus, under Kentucky law, Ross became a holdover tenant in September 1998, *see* KY. REV. STAT. ANN. § 383.160 (Baldwin 1999),[3] and, as such, the terms of his original lease applied during the term of his holdover tenancy. *See Cass v. Home Tobacco Warehouse Co.*, 311 Ky. 95, 223 S.W.2d 569, 571 (Ky.1949) (citation omitted). Ross's original lease provided that whenever "any installment of rent is due and unpaid for more than three days" after it becomes due, "[t]he Lessee agrees to vacate the premises without demand and without notice." Ross's rent was due and unpaid during June, July, August, and September 1999—far longer than the three days allowed for by the lease. Therefore, according to the terms of the lease, in September 1999, the time that the warrantless searches were conducted, Ross did not have a reasonable expectation of privacy in his apartment because he was obligated to vacate the premises upon his failure to pay rent. Even if, as Ross argues, Riley was obligated under Kentucky law to institute formal eviction proceedings before he, as the landlord, could regain full possession of the

---

**3.** Section 383.160(1) provides:

If, by contract, a term or tenancy for a year or more is to expire on a certain day, the tenant shall abandon the premises on that day, unless by express contract he secures the right to remain longer. If without such contract the tenant shall hold over, he shall not thereby acquire any right to hold or remain on the premises for ninety days after said day, and possession may be recovered without demand or notice if proceedings are instituted within that time. But, if proceedings are not instituted within

ninety days after the day of expiration, then none shall be allowed until the expiration of one year from the day the term or tenancy expired. At the end of that year the tenant shall abandon the premises without demand or notice, or stand in the same relation to his landlord that he did at the expiration of the term or tenancy aforesaid; and so from year to year, until he abandons the premises, is turned out of possession, or makes a new contract.
KY. REV. STAT. ANN. § 383.160 (Baldwin 1999).

apartment, that does not change the fact that Ross had no reasonable expectation of privacy in an apartment to which he had no legal claim.

In light of the fact that Ross failed to pay his rent for four months, in clear violation of the terms of his original lease, and failed to return to his apartment for three months, the Court finds that the district court did not err in its conclusion that Ross did not have a legitimate expectation of privacy in the apartment.

### B. Motion to Dismiss the Superseding Indictment

■ Ross argues that the superseding indictment is unconstitutionally vague and overbroad because it spans a period of over two years and fails to specify the manner in which the crimes were committed. This Court reviews the sufficiency of an indictment *de novo. See United States v. Gatewood,* 173 F.3d 983, 986 (6th Cir. 1999). Upon review, the Court finds that the district court properly concluded that the superseding indictment is constitutional.

■ An indictment must satisfy two requirements to be constitutional: (1) it must give the defendant notice of the charge against him and set out all of the elements of the charged offense; and (2) it must be sufficiently specific such that the defendant may plead double jeopardy in a subsequent proceeding. *United States v. Martinez,* 981 F.2d 867, 872 (6th Cir.1992) (citing *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). As the district court properly found, the superseding indictment meets these requirements by identifying the elements of the charged offenses, the specific statutory provision alleged to have been violated, the controlled substance involved, and the location and time frame of the alleged criminal activity. *See Hamling v.*

*United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'") (citation omitted).

Therefore, the district court properly denied Defendant–Appellant's motion to dismiss the superseding indictment as vague and overbroad.

### C. Oral Motion to Delete Language from Indictment

■ Ross argues that the district court erred in granting the Government's oral motion to strike the words "with intent to distribute" from Counts One and Three of the superseding indictment because the deletion of this language amended the superseding indictment in violation of the Fifth Amendment to the United States Constitution.

■ The Fifth Amendment requires that defendants be tried only for criminal conduct that is presented in an indictment handed down by a grand jury. *Stirone v. United States,* 361 U.S. 212, 217–19, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (holding that the Fifth Amendment is violated when an indictment is modified at trial to broaden the charges against the accused); *United States v. Ford,* 872 F.2d 1231, 1235 (6th Cir.1989) (same). An indictment can be improperly modified in one of two ways: either through (1) a variance, whereby "the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment"; or (2) an amendment, whereby "the charging terms of the indictment are altered, either literal-

ly or in effect, by prosecutor or court after the grand jury has last passed upon them." *Ford*, 872 F.2d at 1235. Here, Defendant–Appellant alleges that the Government improperly altered the indictment through an amendment.

The Court reviews *de novo* a district court's determination of whether an indictment has been unconstitutionally amended. *See United States v. Prince*, 214 F.3d 740, 756 (6th Cir.2000), *cert. denied*, 531 U.S. 974, 121 S.Ct. 417, 148 L.Ed.2d 322 (2000). This Court has specifically held that the deletion of terms that are not required elements of the offense charged does not constitute an unconstitutional amendment of the indictment. *See United States v. Caldwell*, 176 F.3d 898, 899–903 (6th Cir. 1999) (reasoning that surplus language in an indictment does not become an element of the offense), *abrogated on other grounds, Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Thus, in the matter *sub judice*, the government did not improperly amend the indictment by deleting the language "with intent to distribute" from Counts One and Three because intent to distribute is not an element of the crimes alleged in those counts. *See* 21 U.S.C. § 841(a)(1) (stating that it is unlawful for any person knowingly or intentionally to manufacture a controlled substance); *Caldwell*, 176 F.3d at 900 (holding that the elements of a violation of § 841(a)(1) for manufacturing a controlled substance are (1) the defendant knowingly or intentionally (2) manufactured the controlled substance). Thus, the language that was stricken constituted mere surplusage, not an element of the crimes with which the Defendant–Appellant was charged.

Therefore, the district court did not err in granting the government's oral motion to strike the phrase "with the intent to distribute" from Counts One and Three of the superseding indictment.

**D. Sufficiency of the Evidence to Support the Conviction**

■ Ross argues that the jury's verdict was not supported by sufficient evidence. Specifically, he contends that there was insufficient evidence linking Ross to the incriminating materials found in his apartment, especially in light of the Government's theory that he had abandoned his apartment. Ross points out that, while Larue testified that he and Ross's brother got methamphetamine and LSD from Ross's apartment, Larue did not testify that he ever actually saw Ross in the apartment or with the drugs at all. He also notes that other people had access to his apartment, including the students who house sat for Ross while he was away.

This Court reviews *de novo* the sufficiency of the evidence to support a conviction. *See United States v. Gibson*, 896 F.2d 206, 209 (6th Cir.1990). The Court must review the record in the light most favorable to the prosecution and grant relief only if no rational jury could have found guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Abner*, 35 F.3d 251, 253 (6th Cir.1994). In applying this standard, the Court must "give[ ] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

In this case, there was ample evidence from which a reasonable jury could find that Ross attempted to manufacture methamphetamine. A number of chemical substances commonly used in the manufacture of methamphetamine (including hydrochloric acid, phenyl acetic acid, benzene,

acetone, formaldehyde, red phosphorous, muriatic acid, and lithium) were found in Ross's apartment, as were other incriminating materials, such as glassware containing chemical substances in various stages of synthesis of methamphetamine, and a book and notes on the manufacture of methamphetamine. Furthermore, Ross's fingerprints were found on at least one of the pieces of glassware containing chemicals in the synthesis process. In addition, Larue testified that he and Ross had discussed the manufacture of methamphetamine on multiple occasions. Although this evidence is circumstantial, it is nonetheless convincing, particularly when viewed in the light most favorable to the prosecution. Thus, the jury was clearly entitled to accept the Government's evidence, and to reject Ross's theory that someone other than him must have left the incriminating evidence in his apartment during his absence. *See United States v. Hill,* 142 F.3d 305, 311 (6th Cir.1998) (rejecting the defendant's argument that, because he was never caught selling drugs and because several other people had access to his apartment, there was insufficient evidence to convict him of possession with intent to distribute where the defendant was found in possession of a cell phone, pager, large sums of cash, and the key to his apartment).

Therefore, this Court finds that the jury's verdict of guilt is supported by sufficient evidence.

### III. CONCLUSION

Based on the foregoing discussion, the Court **AFFIRMS** Defendant–Appellant's conviction.