*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0217p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 04-1325

ALAN LOUIS HUNYADY,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 02-50059—Paul V. Gadola, District Judge.

Submitted: April 22, 2005

Decided and Filed: May 17, 2005

Before: SUHRHEINRICH and GILMAN, Circuit Judges; ACKERMAN, District Judge.[*]

———————————

**COUNSEL**

**ON BRIEF:** Thomas M. Donnellan, Flint, Michigan, for Appellant. Robert W. Haviland, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Alan Louis Hunyady was living in the home of his deceased father without the consent of the personal representative of his father's estate, to whom control of the house had been given. After the representative informed federal agents that he had seen two machine guns and a silencer at the residence, he agreed to let them search the premises. When the house was searched, the agents found the firearms and silencer that belonged to Hunyady. Hunyady was subsequently charged with, and pled guilty to, being in possession of an unregistered machine gun, and was sentenced by the court to 33 months of imprisonment. He now appeals the district court's rejection of his motion to suppress the evidence taken from the residence. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

———————————

[*] The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

# I. BACKGROUND

Hunyady's father, Leslie Hunyady, owned and lived in a house located at 5437 Country Lane in Flint, Michigan. Prior to his death, Leslie Hunyady permitted his son to reside there without signing a lease and without paying rent. Upon Leslie Hunyady's death on December 18, 2001, however, the residence was entrusted to James Visser, as the personal representative of the decedent's estate, to manage on the estate's behalf. Leslie Hunyady's will made no provision for his son, who was, at the time of his father's death, living at the residence as well as at another house in Clio, Michigan. (The majority of Hunyady's personal effects were at the Clio residence, but he kept his "work clothes" at the Country Lane property.)

Hunyady's memory is hazy because of an injury sustained in an earlier car accident. He was nonetheless able to testify at trial that, on or about January 2, 2002, Visser informed him that he "would have to move out of 5437 Country Lane." In addition to this verbal warning, Visser went to the house either later that day or the next and changed the locks. When Hunyady returned to the residence approximately five days later, he was unable to enter using his old key. He instead pushed open a basement window, crawled inside, and resumed living on the premises. Sometime in early February, Visser provided Hunyady with a formal notice to quit the property, giving him until March 3, 2002 to vacate.

Visser entered the residence frequently throughout January and February of 2002 in order to prepare the property for sale. On February 25, 2002, Visser was in the house taking an inventory of Leslie Hunyady's property when he noticed two machine guns and a silencer belonging to Hunyady. Visser photographed the firearms and, the same day, took the photographs to the United States Bureau of Alcohol, Tobacco, and Firearms (BATF) office. There, he spoke with BATF Special Agent John Miller. In addition to showing Agent Miller the photographs, Visser provided him with (1) a copy of a deed showing that the 5437 Country Lane property had been conveyed to Leslie Hunyady, (2) a "Letter of Authority" from the Genesee County Probate Court that officially appointed Visser as the personal representative of Leslie Hunyady's estate, and (3) a copy of Leslie Hunyady's will. He also showed Agent Miller a key to the residence. Visser requested that BATF agents accompany him there to remove the firearms and also explicitly consented to a search of the premises.

After Visser departed, Agent Miller looked up Hunyady's name on a federal database and discovered that Hunyady was a convicted felon. Agent Miller then telephoned Assistant United States Attorney Robert Haviland for guidance. Haviland, who is also the government's counsel in the present case, informed Agent Miller that "if Alan Hunyady had simply broken into the residence, he was a mere trespasser with no legitimate expectation of privacy in the home, and that Mr. Visser, as a personal representative, had the authority to admit [B]ATF agents if he wished to do so."

The next day, February 26, 2002, Visser, Agent Miller, and three other BATF agents arrived at the 5437 Country Lane property. They suspected that Hunyady was inside, so Agent Miller asked Visser to knock on the front door. According to Agent Miller, Visser knocked and

> the front door was then opened by Alan Hunyady. Mr. Hunyady allowed Mr. Visser to enter, and Mr. Visser then allowed me and the other agents inside. As requested by Mr. Visser, I searched the residence, finding and seizing as evidence the assault rifles; the silencer; and several hundred rounds of ammunition.

Hunyady was subsequently indicted by a grand jury on the following three counts: Count One, being in possession of an unregistered machine gun in violation of 26 U.S.C. § 5861(d); Count Two, being in possession of an unregistered silencer in violation of 26 U.S.C. § 5861(d); and Count Three, being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). At trial,

Hunyady moved to suppress all of the evidence taken from the 5437 Country Lane property.  The district court denied the motion.

Hunyady subsequently pled guilty to Count One, reserving his right to appeal the adverse ruling on the motion to suppress, but waiving his right to appeal the conviction and sentence.  The government then moved to have Counts Two and Three dismissed, which motion was granted by the district court.  Hunyady was subsequently sentenced by the court to 33 months of imprisonment.  This timely appeal followed.

## II.  ANALYSIS

### A.    Standard of review

In reviewing a district court's denial of a motion to suppress evidence, this court will not set aside the district court's factual findings unless they are clearly erroneous.  *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004).  Legal conclusions are reviewed de novo.  *Id.*  Neither party claims that the district court misapprehended any facts in the present case.  The issues before us are therefore reviewable under the de novo standard.  *Id.*

### B.    The district court did not err in concluding that Hunyady had no legitimate expectation of privacy at the 5437 Country Lane property

A place to be searched "need not be [the defendant's] 'home,' temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there.  '[T]he Fourth Amendment protects people, not places,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy."  *Minnesota v. Olson*, 495 U.S. 91, 97 (1990) (holding that a defendant who was a houseguest at the residence of two friends had a legitimate expectation of privacy in his own room) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).  In order to avail himself of the protection offered by the Fourth Amendment, Hunyady must therefore demonstrate that he had a legitimate expectation of privacy at the 5437 Country Lane property.  *See id.*; *see also Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").

"A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate."  *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).  The "factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched."  *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (concluding that a defendant who had been living in a vacant house for approximately one week had failed to demonstrate that he had a legitimate expectation of privacy); *see also United States v. Dodds*, 946 F.2d 726, 728-29 (10th Cir. 1991) (concluding that a defendant apprehended in an abandoned apartment where he sometimes slept had failed to demonstrate that he had a legitimate expectation of privacy).

Even if Hunyady can demonstrate that he had a "subjective expectation of privacy," he must also demonstrate that his "expectation is one that society is prepared to recognize as legitimate."  *Pollard*, 215 F.3d at 647.  The first factor to be examined in this inquiry is the nature of Hunyady's tenancy pursuant to the "state's landlord-tenant law."  *United States v. Ross*, No. 00-6453, 2002 WL 1478586, at *5 (6th Cir. July 9, 2002) (unpublished).  The district court accepted for the sake of argument that Hunyady was a tenant by sufferance.  (This classification was also accepted, somewhat surprisingly, by the government.)

In Michigan, a tenant by sufferance is one "who came into possession [of the property] rightfully, by permission of the owner, and continued to occupy the premises after the expiration of his lease." *Ryal's, Inc. v. Stavropoulos*, 263 N.W. 770, 770 (Mich. 1935); *see also School Dist. No. 11of Alpine Township v. Batsche*, 64 N.W. 196, 197 (Mich. 1895) ("[T]he rule is that a person in possession of land lawfully, who holds over without right, becomes a tenant at sufferance, if the owner suffers him to remain in possession a sufficient length of time to imply an intentional acquiescence in the occupancy, and it is not necessary that the previous holding be that of a tenant."). Accordingly, Hunyady emphasizes that he was in lawful residence at the 5437 Country Lane property at the time of his father's death, and continued residing at the property for some time thereafter. He therefore argues that he was entitled to rely on the notice to quit provided to him by Visser that gave him until March 3, 2002 to vacate the premises.

We believe that classifying Hunyady a tenant by sufferance, however, is a misapprehension of Michigan common law, because it presupposes a tacit acceptance of his presence by Visser. Indeed, at common law, the defining element of a tenancy by sufferance is the passive acquiescence by the property owner. In a tenancy by sufferance, in other words, the landlord "suffers" the tenant's presence. Michigan caselaw on this point, though limited, is clear. *See Ives v. Williams*, 15 N.W. 33, 36 (Mich. 1883) (concluding that a tenancy by sufferance may arise where there is "a holding over by the tenants and an *apparent acquiescence of the landlord* and where the inference or implication is a necessary one") (emphasis added); *Allen v. Carpenter*, 15 Mich. 25 (Mich. 1866) ("It is also well settled, that a tenant at sufferance is not a trespasser, unless he attempts to hold over after the landlord re-enters and terminates that peculiar occupancy.") (Campbell, J., concurring); *cf. School Dist. No. 11*, 64 N.W. at 197 ("[I]t is true, that, in order to have the effect to create a tenancy by sufferance, the occupancy must be sufficiently long to warrant an *inference of consent* to a different holding") (emphasis added). Even in the case cited by Hunyady, *Felt v. Methodist Educational Advance*, 232 N.W. 178 (Mich. 1930), the defendant corporation became a tenant by sufferance only after being "in possession [of the property after the decedent's death] for approximately two years *without objection* from the remaindermen." *Id.* at 180 (emphasis added).

In contrast, Hunyady had been living at the residence without Visser's permission for only a few weeks. Visser had, moreover, made at least two obvious attempts to evict Hunyady from the premises. The first attempt was on or around January 2, 2002, when Visser verbally informed Hunyady that he "would have to move out of 5437 Country Lane." Visser's second attempt took place either later that day or the next day when he went to the residence and changed the locks. These actions evince Visser's desire that Hunyady immediately vacate the premises.

Because Visser had not acquiesced to Hunyady's presence on the property, Hunyady's argument that he was a tenant by sufferance under Michigan law is unpersuasive. We believe that Hunyady was instead a trespasser under Michigan law at the time of the search in question. His entry to the house through a basement window after Visser changed the locks is fully consistent with the latter classification. *See, e.g.*, *Stitt v. Holland Abundant Life Fellowship*, 614 N.W.2d 88, 91 (Mich. 2000) (defining a trespasser as one "who enters upon another's land, without the landowner's consent."). As such, his presence at the 5437 Country Lane property was, as the district court noted, wrongful, the notice to quit notwithstanding. We therefore find Hunyady's argument that he had a legitimate expectation of privacy without merit.

Hunyady's wrongful presence on the property at the time of the search makes this case similar to *United States v. Ross*, No. 00-6453, 2002 WL 1478586, at *4-5 (6th Cir. July 9, 2002) (unpublished). In *Ross*, the defendant had rented an apartment on a month-by-month basis, but had abruptly stopped making payments. Four months after the payments stopped, the police entered the apartment with the landlord's permission and found traces of cocaine. The court rejected Ross's claim that he had a legitimate expectation of privacy, observing that "a tenant's expectation of privacy in his apartment ceases to be 'objectively justifiable' when his occupancy ceases to be

lawful, as determined by the terms of his lease and the provisions of his state's landlord-tenant law." *Id.* at *5. It then concluded that, "according to the terms of the lease, in September 1999, the time that the warrantless searches were conducted, Ross did not have a reasonable expectation of privacy in his apartment because he was obligated to vacate the premises upon his failure to pay rent." *Id.*; *see also United States v. Allen*, 106 F.3d 695, 698-99 (6th Cir. 1997) (holding that a defendant who failed to remain current on his rental payments lacked a legitimate expectation of privacy in his hotel room).

The general circumstances of Hunyady's presence at the Country Lane property also weigh against his argument that his "expectation [of privacy] is one that society is prepared to recognize as legitimate," *Pollard*, 215 F.3d at 647. First, as noted by the district court, Visser was always coming in and out of the property. Hunyady was aware that Visser was legally responsible for the property, and he also knew that Visser was preparing the house for sale. In addition, the record reflects that Hunyady maintained another residence in Clio, Michigan. He also admitted that most of his personal belongings were at the Clio residence at the time the firearms and silencer were seized, and that he kept only his "work clothes' at the Country Lane property.

The relationship of Hunyady to the residence was therefore similar to the one in *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998), where the court concluded that a defendant who had been living in a vacant house for approximately one week had failed to demonstrate that he had a legitimate expectation of privacy. Because Hunyady's presence on the property was wrongful, and because he had a tenuous connection to an otherwise empty house, he had no legitimate expectation of privacy. We therefore conclude that the district court did not err in denying Hunyady's motion to suppress.

**C.     Alternatively, the search was valid because Visser had either actual or apparent common authority with Hunyady to consent to the search**

The government argues that, even if Hunyady did have a legitimate expectation of privacy in the 5437 Country Lane property, the denial of Hunyady's motion to suppress was nonetheless proper because the BATF agents properly relied on the fact that Visser consented to the search. We agree.

In *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the Supreme Court reaffirmed the principle that

> a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of "unreasonable searches and seizures" if the officers have obtained the consent of a third party who possesses common authority over the premises.

*Id.* at 179. The Court has further held that "common authority" is not to be implied from concepts of property law, "but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171-72 n.7 (1974).

And even if  third party does not in fact possess common authority over the property searched, this court has determined that "the Fourth Amendment is not violated if the police relied in good faith on a third party's *apparent* authority to consent to the search." *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (relying on *Illinois v. Rodriguez*, 497 U.S. at 188-89) (emphasis added). "Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could

conclude from the facts available that the third party had authority to consent to the search." *Gillis*, 358 F.3d at 390-91 (citations omitted).

Hunyady contends that the government's argument is misplaced because "Visser was consenting to a search of a place actually occupied by another," and because the agents unreasonably overlooked the fact that Hunyady had been provided with a notice to quit. But, as discussed above, Hunyady's status at the time of the search was that of a trespasser rather than a tenant by sufferance. The notice to quit was thus unnecessary and gave him no legitimate expectation of privacy. In addition, the agents relied on the documents produced by Visser, i.e., the deed, the will, and the Letter of Authority. Visser also showed Agent Miller a key to the residence and mentioned that he had been in the residence earlier that day.

Taken together, these documents and facts proved that Visser had "the right to permit the inspection in his own right" and that, even if Hunyady was a lawful occupant of the premises, he had nonetheless "assumed the risk that [he] might permit the common area to be searched." *Matlock*, 415 U.S. at 172 n.7. Visser thus had the common authority with Hunyady to consent to the search of the 5437 Country Lane property.

These documents would also, at the very least, have allowed the "officers [to] reasonably . . . conclude from the facts available that the third party had authority to consent to the search." *Gillis*, 358 F.3d at 390-91 (citations omitted). From the deed, Agent Miller could reasonably determine that the property belonged to Leslie Hunyady. And from Leslie Hunyady's will and the Letter of Authority, he could have reasonably concluded that Visser was the personal representative of the estate and the one legally responsible for the property's management. Agent Miller also consulted with Assistant United States Attorney Haviland, who informed him that Hunyady was most likely a trespasser onto the property. In light of these facts, the BATF agents reasonably concluded that Visser had the authority to consent to the search.

### III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court. We further note that because Hunyady has waived his right to file an appeal from his sentence, we need not consider any claims that he might otherwise have had under *United States v. Booker*, 125 S. Ct. 738 (2005).