RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

TRACY WASHINGTON,

*Defendant-Appellee.*

No. 08-3317

_____

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00052-001—Michael R. Barrett, District Judge.

Argued: June 12, 2009

Decided and Filed: July 22, 2009

Before: BOGGS, Chief Judge; and BATCHELDER and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Daniel S. Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard W. Smith-Monahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Daniel S. Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard W. Smith-Monahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

BOGGS, Chief Judge. In the early morning hours of Christmas day, two police officers entered George Young's apartment without his permission or a warrant. His nephew, Tracy Washington, had been residing in the apartment for several months and was entertaining friends. Young was in jail at the time and the police told Washington that he was suspected of criminal trespass. Despite Washington's vigorous and repeated objections,

1

these officers patted him down and searched the apartment, finding illegal drugs, drug paraphernalia, and a loaded gun. We affirm the district court's suppression of this evidence because the Fourth Amendment prohibits the warrantless search of a private home to investigate minor offenses, such as this one, that do not pose any threat of imminent violence or result in an ongoing injury to the community.

I

Washington began living with his uncle, George Young, in the fall of 2006 at 1906 Elm Street, Cincinnati, Ohio. Police regularly patrolled this building, which was the site of frequent drug arrests and activity. In his deposition, Officer Brendon Rock said that in the course of his six years on the Cincinnati police force, he had responded to disturbances in basically every apartment in the building. During his patrol on December 18, 2006, Officer Rock recognized Young as the man he had recently observed drop a crack pipe in the hallway of the building and arrested him on drug paraphernalia charges. As Officer Rock was ushering Young into a police car, Young shouted up to Washington, who was watching from the window of the apartment, instructing him to secure the apartment and keep people out.

A few days after Young's arrest, the building's landlord, Jeff Moore, informed Officer Rock that he had observed a number of non-residents loitering in the halls. There were already many signs in the hallways indicating that trespassers and non-residents were unwelcome, and Moore requested that police officers patrol the building and remove any such individuals. With respect to Young's apartment, Moore told Rock that tenants had informed him there was a great deal of foot traffic and a tenant had seen one man enter the unit with a gun. Moore also apparently told Rock that, in light of Young's arrest, no one was permitted to be in the unit. However, he did not indicate that there had been or would be any attempt to evict Young. Officer Rock did not act on this information immediately or make any effort to obtain a warrant on the basis of this tip. Rather, he agreed to continue patrolling the building's halls.

Driving past the apartment building a few days later at 5:40 am on December 25, 2006, Officer Rock observed two women on the street engaged in a verbal altercation. One of the women involved, Ellen Wilson, told Officer Rock that she was Young's girlfriend and

was looking after his apartment while he was in jail. From the street, Officer Rock observed that the lights in Young's apartment were on. Wilson told Rock that there were two people in the unit. She did not request his help or say they were trespassing. Nevertheless, Rock claims that his unspoken assumption at the time was that any visitors were trespassing because the landlord had previously told him that no one other than Young was permitted in the unit. At Rock's request, Wilson agreed to let the police search the apartment. For his own part, Rock later testified that he did not believe Wilson had authority to consent to the search. Asked why he bothered obtaining her written authorization, he explained, "to cover all my bases."

Wilson accompanied Rock to the apartment, knocked on the door and exclaimed that she was with the police. An unknown person in the apartment opened the door. Officer Rock and his partner entered. Washington was among those who were immediately visible, and he became belligerent and told Rock that he was not allowed in the apartment. Officer Rock testified that drug paraphernalia in the living room was in plain view once he was inside the apartment. Nothing in the record suggests this material was visible from the doorway. Upon seeing this evidence of criminal activity, Rock asked the defendant if he had anything illegal in his possession. Washington replied, "You can't search me." Officer Rock informed Washington that he was suspected of criminal trespass and would be patted down. Washington then stated, "I'm dirty." Rock asked again whether Washington possessed anything illegal. Washington nodded affirmatively. Rock asked if it was a firearm, and Washington nodded affirmatively a second time. Rock and his partner placed Washington in handcuffs and retrieved a .357 revolver from the waistband of Washington's pants and a crack pipe from his pocket.

A criminal history check revealed that Washington was a previously convicted felon imprisoned for more than one year and so he was charged under 18 U.S.C. § 922(g)(1) for being in possession of a firearm. Although the district court initially denied the defendant's motion to suppress for lack of standing, it then granted the defendant's motion to reconsider and suppressed the evidence in light of defendant's evidence showing that he had an expectation of privacy in the unit and that the search violated the Fourth Amendment. In its motion to reconsider, the government for the first time argued that, even if Washington had an expectation of privacy, both probable cause and exigent circumstances justified the

warrantless search of the apartment. The district court denied this motion, and the government appeals. There are two issues before us: first, did the district court err in concluding that Washington demonstrated an expectation of privacy in the apartment such that he now has standing to assert the search violated the Fourth Amendment? And second, has the government demonstrated that exigent circumstances justified the search so as to overcome the Fourth Amendment presumption of unreasonableness that attaches to warrantless searches of a private home?

II

"When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo." *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). Washington's standing to challenge the search of his uncle's apartment hinges on whether he had a reasonable expectation of privacy in the residence. To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable. *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir.), *cert. denied*, 531 U.S. 999 (2000). An expectation is objectively reasonable only when it is one that "society is prepared to recognize as legitimate." *Ibid.*

The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents. *See id.* at 647-48 (holding that an occasional overnight guest who was permitted to be in the residence alone and who kept personal belongings in a closet in the living room had a reasonable expectation of privacy). In certain cases, this circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence. *See United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (holding that a transient person who was never an overnight guest had a reasonable expectation of privacy in a friend's apartment where he showered, changed clothes, and kept some personal possessions).

On appeal, the government concedes that Washington had a subjective expectation of privacy,[1] Br. Appellant at 28, but gives several reasons why this expectation was objectively unreasonable. First, the government contends that because Washington was previously arrested for trespassing in a different unit of the same apartment building, he could not possibly maintain an objectively reasonable expectation of privacy in the apartment leased by his uncle. Br. Appellant at 30. The government cites no legal precedent in support of this claim, and it is without merit. A person who trespasses in one apartment may legitimately live in another; he is not thereby cast out of the habitation.

Next, the government contends that society does not recognize Washington's expectation of privacy as reasonable because he was engaged in criminal activities in the apartment. *See* Br. Appellant at 31. Although it is certainly true a person cannot acquire an expectation of privacy in a structure that has been legally condemned such that any presence is forbidden, *United States v. Whitehead*, 415 F.3d 583, 587-88 (6th Cir. 2005), the use of a space for illegal activity does not alter the privacy expectations of a person who would otherwise have standing. *Minnesota v. Carter*, 525 U.S. 83, 91 (1998); *see also id.* at 109-10 ("As the Solicitor General acknowledged, the illegality of the host-guest conduct, the fact that they were partners in crime, would not alter the analysis. . . . If the illegality of the activity made constitutional an otherwise unconstitutional search, such Fourth Amendment protection, reserved for the innocent only, would have little force in regulating police behavior toward either the innocent or the guilty.") (Ginsburg, J. dissenting). In light of the fact that Washington had been lawfully residing in the apartment for several months, the notion that drug use or illegal activity eviscerates any right to challenge a search cannot possibly be sustained. A criminal may assert a violation of the Fourth Amendment just as well as a saint.

---

[1]The district court's determination was not clearly erroneous. Young testified that he had given his nephew keys to the unit and permission to reside in the building. Washington was a frequent overnight guest who kept clothes and other possessions there. Washington's brother also testified that the defendant was living with Young. A person may acquire a reasonable expectation of privacy in property in which he has neither ownership nor any other legal interest. In *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at 96-97.

The government's last argument, perhaps related to its previous one, is that Washington does not have standing to assert a Fourth Amendment violation because his legal status at the time of the search was that of a trespasser. Br. Appellant at 29-30. We have previously held that landlord-tenant law determines whether a person's expectation of privacy is objectively reasonable under the Fourth Amendment. *United States v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005). By definition, trespassers cannot have an objectively reasonable expectation of privacy in the property on which they are trespassing. *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998). But in this case, Young undeniably acquired a legitimate interest in the apartment when he signed a lease and invited Washington onto his property. According to the government, Washington was nevertheless a trespasser because Young's lease barred multiple occupants and prohibited tenants from using their apartments for illegal activity. The government also contends that Young's failure to pay rent on a timely basis in December 2006, the month of the search, diminished his "ability to confer overnight guest status on other occupants of his apartment." Br. Appellant at 30. Leaving aside the specific allegations of how Young purportedly violated his lease, the very premise of the government's argument is flawed because no lawful efforts were ever undertaken to evict Young or Washington from the apartment.

The landlord's mere authority to evict a person cannot of itself deprive that person of an objectively reasonable expectation of privacy. There are extensive legal procedures that a landlord must adhere to before occupants are lawfully dispossessed of property without their consent, and the landlord's failure to evict an occupant who is in technical violation of the lease effectively waives whatever authority the landlord has to treat a person as a trespasser. 49 AM. JUR. 2D *Landlord and Tenant* § 260 (2009) ("As general rule, any act of the landlord that affirms the existence of the lease and recognizes the tenant as lessee, after the landlord has knowledge of a breach of the lease which would constitute a cause to terminate the lease, results in a waiver by the landlord of the right to declare a forfeiture of the lease."); 52 C.J.S. *Landlord & Tenant* § 185 (2009) ("When a tenant demonstrates that a landlord long had knowledge of the breach of a real property lease, yet provided no notice of it to the tenant, the landlord is considered to

have encouraged the default, and therefore, should not be allowed to take advantage of it by claiming forfeiture of lease by the breach."). In this case, the landlord never availed himself of these legal procedures. Indeed, Young's landlord continued accepting rent in the months after he discovered that Washington lived on the premises and after other residents began complaining of possible drug activity in connection with his specific apartment.

In fact, this case illustrates the intolerable implications of the government's claim. The breach on which the government now primarily relies is that "Young got behind on his rent . . . sometime in December of 2006." The only support for this allegation is the landlord's agreement with a leading question at the suppression hearing. And there is no evidence that rent was still overdue at the time of the search or that Officer Rock was even aware of any late rent. If a landlord's unexercised authority over a lodging with overdue rent alone divested any occupant of a reasonable expectation of privacy, millions of tenants and their guests would be deprived of Fourth Amendment protection. Paying late is a common occurrence, especially in economically turbulent times, and we reject the notion that the Constitution ceases to apply in these circumstances.

This result is completely consistent with landlord-tenant law. Under Ohio law, "a tenant who 'holds over' is a tenant at sufferance and the landlord *may elect* to treat him as a trespasser." *Cleveland v. A.J. Rose Mfg. Co.*, 624 N.E. 2d 245, 248 (Oh. Ct. App. 1993) (emphasis added). However, an occupant is not a trespasser if the landlord does not treat him as such. *Pollard*, 215 F.3d at 647. Accepting rent, fulfilling service requests, and failing to invoke the remedial provisions of the lease in spite of a lessee's breach are all ways a landlord might affirm the continuation of a lease and recognize that the tenant is lawfully present. *See, e.g.*, *Cuyahoga Metro. Hous. Auth. v. Hairston*, 124 Ohio Misc. 2d 1, 2 (Cleveland Mun. Ct. 2003); *Brokamp v. Linneman*, 153 N.E. 130, 131 (Ohio Ct. App. 1923); *Quinn v. Cardinal Foods, Inc.*, 485 N.E. 2d 741, 744-45 (Ohio Ct. App. 1984); *see also* 49 AM. JUR. 2D *Landlord and Tenant* § 267.

In support of its argument that the district court erred, the government cites several cases, none of which defeats our conclusion that a lawful occupant of an apartment is not analogous to a trespasser simply because the landlord has the legal authority to evict him. In *United States v. Allen*, 106 F.3d 695 (6th Cir. 1997), we held that a hotel guest's use of a room for illegal purposes *and* beyond the pre-paid rental period vitiates the guest's reasonable expectation of privacy. The motel manager in *Allen* had properly evicted the defendant in that case from the room prior to consenting to a police search. By comparison, the landlord in this case never exercised any lawful authority over the premises that deprived the defendant of a reasonable expectation of privacy and standing to challenge a search under the Fourth Amendment. Further, the nature of the interest held in an apartment differs from that of a hotel room. While tenants may generally hold over an apartment and are expected to give a landlord notice of their intent to leave, a hotel guest's right to a room is limited to a predetermined period of occupancy. There is a presumption, in other words, that hotel guests will check out at the designated time and their right in the premises does not automatically continue for some indefinite period.

Another case the government cites, *United States v. Hunyady*, is similarly inapplicable. In *Hunyady*, we held that a man who continued to live in a house owned by his dead father, even after the representative of the estate had the locks changed, did not have standing to assert a violation of the Fourth Amendment. 409 F.3d at 301-02. The defendant's only basis in asserting an expectation of privacy in that case was his refusal to acquiesce to the representative's lawful attempts to eject him. *Ibid.* There is nothing contradictory about holding that Washington's expectation of privacy is legitimate and fundamentally distinct from the expectation of an occupant who broke into a home after the locks had been changed to keep him out.

The only apposite authority that the government relies on is *United States v. Ross*, 43 F. App'x 751 (6th Cir. 2002). In that case, we had to determine whether a month-to-month tenant had a reasonable expectation of privacy in his apartment even though he abandoned the property two months before the search, had not paid rent in

four months, and did not tell the landlord that he intended to return. *Id.* at 757. Ross's lease also stipulated that a lessee must vacate the premises without any demand from the landlord if "any installment of rent is due and unpaid for more than three days." *Ibid.* In several obvious ways, *Ross* is distinguishable from the case at bar: Washington never abandoned the apartment; rent was at most twenty-five days overdue, if overdue at all; and Young's lease did not specify that he had to vacate the premises immediately in the event of late payment. For the sake of clarity, however, we note that *Ross* is unpublished and not binding, and we do not adhere to it to the extent it could be read to imply that a tenant's violation of a lease can alone deprive him and his guests of a legitimate expectation of privacy. *Id.* at 757-58.

III

Because Washington had a legitimate expectation of privacy independent of the landlord's right to evict him and we affirm the district court's decision on standing, we now proceed to consider whether the investigation of a criminal trespass constitutes an exigency such that the warrantless search of Washington's apartment was reasonable under the Fourth Amendment. "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740 (1984); *see also Hardesty v. Hamburg Twp.*, 461 F.3d 646, 655 (6th Cir. 2006) ("The government bears the burden of proving that exigent circumstances . . . justify a warrantless search.").

In its original opinion and order suppressing evidence, the district court never addressed and the government did not raise the issue of exigent circumstances. This issue instead came up for the first time in the government's motion for reconsideration, Pl.'s Mot. Recons. at 4 (asserting that Officer Rock entered the apartment "in response to apparent on going [sic], immediate criminal activity"), and the district court denied this motion without elaborating on the merits of the government's argument. The government's failure to raise these points as an alternative justification in either of its two pleadings opposing the suppression of evidence arguably results in their waiver. *See United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). But because the

district court did not explicitly address the government's argument or explain why it was denying the motion for reconsideration, we will address whether the warrantless search was reasonable under the Fourth Amendment.

In support of holding that the circumstances here, viewed objectively, presented an exigency, the government observes that "the unit was supposed to be vacant" and that the landlord informed the police that tenants saw "several people, some of them armed, . . . going in and out of the unit during the past week." Br. Appellant at 18. As we have previously noted, nothing in the record indicates that officers saw any contraband from the doorway. Rather, the sole exigency stems from Officer Rock's belief that an ongoing criminal trespass was taking place.

A search of a home conducted without a warrant violates the Fourth Amendment with "only . . . a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court has recognized four circumstances in which "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search [of a person's home or his person] is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978)). Exigent circumstances are present as a matter of law (1) to engage in hot pursuit of a fleeing felon; (2) to prevent the imminent destruction of evidence; (3) to prevent a suspect from escaping; and (4) to prevent imminent harm to police or third parties. *Ibid.*; *see also United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).

With good reason, the government does not contend this case falls into any of these categories. After all, Officer Rock was clearly not engaged in the "hot pursuit" of any suspect, let alone a fleeing felon; there was no reason to think that allowing an ongoing criminal trespass to continue would result in the destruction of any evidence or the suspect's escape; and the fact that Officer Rock did not call for backup until after he entered the apartment strongly suggests that he did not believe the men were armed or,

at a minimum, that an immediate search of the residence was necessary to prevent imminent harm to himself or third parties.[2]

Of course, we have previously observed that "the Fourth Amendment's broad language of 'reasonableness' is flatly at odds with any claim of a fixed and immutable list of established exigencies." *Rohrig*, 98 F.3d at 1519. In *Brigham City*, for example, officers observed a fist fight from outside a home in which a loud party was taking place. 547 U.S. at 403. After observing that a person involved in the fight appeared to be injured, police officers entered the home without a warrant. *Ibid.* Holding that exigent circumstances justified immediate entry into the home, the Supreme Court relied not just on the potential that further violence might erupt if the police did not intervene, but on the need "to assist persons who are seriously injured or threatened with such injury." *Ibid.* As the Court explained, the police play a critical role not just in "preventing violence and restoring order," but in rendering emergency aid pursuant to the police force's role as community caretakers. *Id.* at 406.

There is simply no legal support for holding that an ongoing criminal trespass, on its own, constitutes an exigency that overrides the warrant requirement. Our previous decisions certainly do not go so far. With one or two exceptions, our decisions fit squarely into the four categories discussed earlier. The exceptions entail the need to stop an ongoing nuisance that is disturbing third parties. In *Rohrig*, police were confronted with a situation in which extremely loud music was coming from a residence in the middle of the night. 98 F.3d at 1519. Responding to numerous complaints, police officers first knocked on the door and windows of the residence. *Ibid.* When no one came to the door, the police entered in order to turn off the stereo. *Ibid.* In the course of searching for the stereo and conducting a protective sweep, officers came upon illegal

---

[2]Cases involving imminent harm generally involve such things as burning buildings, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978), or kidnapped minors, *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994), where harm is likely and potentially lethal. However, once the police become aware of a battery, they need not wait to intervene until the threat becomes life-threatening lest a court hold there was no exigency. *Brigham City*, 547 U.S. at 406 ("Nothing in the Fourth Amendment required [the police] to wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.").

drugs. *Ibid.* We held even though there was no threat of physical injury, it was reasonable for the officers to enter the home without a warrant to prevent any further harm to the community. *Ibid.*

As we have repeatedly and consistently observed, the critical issue is whether there is a "true immediacy" that absolves an officer from the need to apply for a warrant and receive approval from an impartial magistrate. *Williams*, 342 F.3d at 438. In burglary cases, the possibility that a lawful resident has been injured or is being held hostage gives rise to exigent circumstances. *See, e.g.*, *United States v. Brown*, 449 F.3d 741 (6th Cir. 2006); *United States v. McClain*, 444 F.3d 556, 563 (6th Cir. 2005). In *Rohrig*, the exigency stemmed from an ongoing injury to the community, even if not resulting in any physical harm. In this case, however, the facts at best evidence the vague potential for harm to persons or property as opposed to an imminent or ongoing harm. Even factoring in reports from days earlier that firearms were present, officers had no reason to believe anyone on the scene intended to use a gun on the property or that those present were stealing Young's possessions or ransacking the apartment. And that Young was in jail meant that he could not be held hostage.

To be fair, the potential danger posed by drug trafficking and drug traffickers is greater than a loud stereo, and Washington's neighbors and landlord no doubt found the additional foot traffic and unsavory characters traveling to and from the unit irksome if not frightening. But the government misreads our caselaw in positing that the rationale of *Rohrig* must therefore extend to the case at bar. Reply Br. Appellant at 6. When people may have the capacity to harm others, but are not engaged in an inherently dangerous activity,[3] officers cannot lawfully dispense with the warrant requirement. An ongoing nuisance that results in non-physical harm to others may constitute an exigency. However, the mere possibility of physical harm does not.

---

[3]The police need not wait until an accident is imminent before they search an area in which they have probable cause to believe explosive materials are being illegally mishandled. Just as the investigation of certain minor offenses will never present an exigency, other offenses may be so inherently dangerous that police can assume from their very ongoing commission that harm is imminent. *See, e.g.*, *United States v. Atchley*, 474 F.3d 840, 851 n. 6 (6th Cir.) (holding that the ongoing operation of a methamphetamine lab in an apartment building constitutes an exigency), *cert. denied*, 127 S. Ct. 2447 (2007).

It is certainly within our authority to identify new circumstances in which an exigency exists even if they fall outside of the traditional categories, as we have done in cases involving community caretaking such as when a warrantless home-entry is the only way for the police to put an immediate stop to an ongoing nuisance. *Rohrig*, 98 F.3d at 1519. To conclude that even when police cannot identify any ongoing injury to the community they may search homes without warrants would not merely go further than our previous cases, it would contradict Supreme Court precedent. In *Welsh v. Wisconsin*, for instance, the Court observed that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest [or search] is being made." 466 U.S. at 753; *McDonald v. United States*, 335 U.S. 451, 459 (1948). The purported exigency in *Welsh* stemmed from the investigation of a civil traffic offense, which the Court held was of insufficient importance to overcome the warrant requirement. Here the underlying offense under Ohio law was criminal trespass—a fourth-degree misdemeanor punishable by a maximum sentence of thirty days' imprisonment. O.R.C. § 2911.21; O.R.C. § 2929.24. While slightly more serious than the offense in *Welsh*, the government's interest in investigating a fourth-degree misdemeanor is still "relatively minor." *Welsh*, 466 U.S. at 750.

If we were to permit a warrantless home entry under these circumstances, which were not urgent or life threatening, the effect would certainly undercut making "the presumption of unreasonableness . . . difficult to rebut." *Ibid.* Rather, it would allow police officers on the scene to cloak themselves in judicial robes even when there is no immediate and serious consequence to waiting for the approval of a neutral and detached magistrate. For this reason, we hold that the community caretaker exception does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large.

IV

The district court did not err in granting defendant's motion to suppress evidence obtained in the search of his uncle's apartment. Here, a police officer engaged in a warrantless search of an apartment after *unreasonably* concluding that an exigency existed. *Cf. Herring v. United States*, 129 S. Ct. 695, 704 (2009) (admitting evidence obtained from an unreasonable search by an officer acting in good-faith reliance on erroneous information provided by another law enforcement agency that negligently maintained its records); *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990) (admitting evidence obtained from a search based on the consent of a third party with apparent authority over the property); *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (admitting evidence obtained from warrantless administrative searches performed in good-faith reliance of a statute later declared unconstitutional). No exception to the exclusionary rule covers the case where the police officer's own conclusion was unreasonable.

V

For these reasons, we AFFIRM the district court's order.