UNITED STATES of America,
Plaintiff,

v.

Donald Demil CLAY, Defendants.

Criminal No. 13–15–GFVT.

United States District Court,
E.D. Kentucky,
Central Division,
at Frankfort.

Signed Feb. 20, 2014.

Hydee R. Hawkins, U.S. Attorney's Office, Lexington, KY, for Plaintiff.

Robert L. Abell, Lexington, KY, for Defendants.

## MEMORANDUM OPINION & ORDER

GREGORY F. VAN TATENHOVE, District Judge.

Magistrate Judge Robert Wier recommends denying Defendant Donald Demil

Clay's motion to suppress certain evidence of cocaine trafficking and firearms offenses discovered by Frankfort police during a search of Clay's apartment. [R. 31]. Clay objects to the Recommendation on narrow grounds. [R. 33]. First, Clay argues that Judge Wier improperly found that Clay's live-in girlfriend, Kendra Mitchell, had apparent authority to consent to a search of the house because she did not have a key, her name was not on the lease, and her statements were corroborated only by evidence found after entry. Second, Clay argues that Judge Wier improperly found a substantial basis for the search warrant containing the generalized representations of an unnamed person, especially when corroboration from the unconstitutional entry is excised. These objections trigger this Court's obligation to conduct a *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C). The Court has satisfied that duty, reviewing the entire record, including the parties' arguments, relevant case law and statutory authority, as well as applicable procedural rules. For the reasons set forth below, the Defendants' objections to the Magistrate Judge's Recommended Disposition shall be **OVERRULED** [R. 33], and his motion to suppress shall be **DENIED**. [R. 20].

## I

The Magistrate Judge conducted an evidentiary hearing on the issues of the Defendants' motion and sets out the factual and procedural background of the case in his Recommended Disposition. [R. 31]. The Court shall not attempt to fully detail what has already been thoroughly described and largely agreed upon, and therefore, incorporates his discussion of the record into this Order.[1] However, to briefly summarize, Donald Clay lived for a period of time in an apartment on Leawood Drive in Frankfort, Kentucky, with his then-girlfriend Kendra Mitchell. Early in April 23, 2013, an altercation between the two caused Mitchell to flee the residence and call the police. The scorned Mitchell met with Sergeant Quire and Lieutenant Sutton of the Frankfort Police Department and, in addition to expressing her desire to press charges for the assault, divulged information about drugs and a gun that Clay kept in a locked closet in the apartment. Quire and Sutton, along with Sergeant Ebert and Officer Roberts, traveled to the residence. Though Mitchell did not have a key, she signed a consent to search form, and the officers obtained a key from officials at the apartment complex. Sutton, Ebert, and Roberts found the locked closet door and then secured the scene while Quire and Detective Courtney drafted an affidavit for a warrant. Quire took the warrant affidavit to the Franklin County Attorney, who approved it. Finding that affidavit established probable cause, Special Circuit Court Judge Reed Rhorer issued the warrant to conduct a search of the locked closet in Clay's apartment. The officers then forced entry into the closet, which was searched along with the rest of the apartment. The search revealed the drugs and gun that Clay now seeks to suppress.

---

1. Clay drafts a somewhat lengthy recitation of the facts, wherein he is critical of the Frankfort police. However, he does not offer a particularized challenge to the Magistrate Judge's factual findings beyond the context of the enumerated objections. As such, the Court need not sift through and weigh again every fact found by the Magistrate Judge. Had Clay sought such a review, a specific objection would have been required. *Mira v.* *Marshall*, 806 F.2d 636, 637 (6th Cir.1986). It bears noting, however, that in reviewing the record and applying the required deference to the Magistrate Judge's factual findings, the Court cannot, in any instance, conclude that they are clearly erroneous, which would be a necessary finding were the Court inclined not to uphold them. *See United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007).

## II

### A

Clay challenges the Magistrate Judge's finding that Mitchell's consent provided the officers with apparent authority to initially enter the apartment. Clay notes that his former girlfriend did not have a key to the apartment and neither of their names were on the lease to the apartment, a fact that the officers knew before initially entering. Further, Clay argues that any evidence that could have corroborated Mitchell's information about the apartment was either discovered after entry—such as the cell phone, indications that two people lived in the apartment, and the locked closet—or was not known to the officers who were actually entering the premises—such as the brown van in the parking lot.

 The Fourth Amendment, which protects against unreasonable searches and seizures, has been interpreted to "draw a firm line at the entrance of the house," such that searches and seizures inside a residence without a warrant are "presumptively unreasonable." *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1511 (6th Cir.1988) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). However, the Constitution is not offended by the warrantless entry of a home when consent to search it is given by someone with common authority over the premises. Common authority "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir.2005) (citing *United States v. Matlock*, 415 U.S. 164, 171–72 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). All parties agree that the one giving consent need not have actual authority to do so, as long as the officers "relied in good faith on a third party's *apparent* authority to consent to the search." *Id.* (citing *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir.2004)).

> Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.

*Id.* (citing *Gillis*, 358 F.3d at 390–91).

There are no shortage of cases wherein a man accused of assaulting and expelling his live-in girlfriend found himself in federal court arguing that she did not have apparent authority to consent to a search of the dwelling where he kept his drugs and guns. Further, a survey of those cases reveal that the Clay's counterparts have found themselves in an uphill battle to make a showing that the women who they cohabitated with did not, in fact, have the apparent authority to consent to a search to the place from which they had been driven by their abusive boyfriends.

In *Illinois v. Rodriguez*, the United States Supreme Court found that a battered live-in girlfriend could potentially be found to have had apparent authority to consent to the search of her boyfriend's residence if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The Court did not provide an exhaustive list of factors to be used in making this determination, but the circumstances under which it remanded the case for further consideration are

somewhat revealing. Gail Fischer, the cohabitating girlfriend of the defendant, approached the police to report that she had been assaulted by her boyfriend. *Id.* at 179, 110 S.Ct. 2793. Fischer indicated that she either lived or had lived in the apartment and maintained clothes and furniture there. *Id.* Though the Court remanded the case for further consideration, the possibility that Fischer had apparent authority to consent to a search of her boyfriend's apartment remained even though there were facts in the record indicating that her name was not on the lease, she did not have access to the apartment when the defendant was away, and that she had removed some of her possessions from the house.

The Court recognized, however, that there might be circumstances wherein someone's representation that they have authority to grant access to a dwelling might be insufficient to constitute valid consent to search it. Specifically, the Court made clear that its holding:

> does not suggest that law enforcement officers may ·always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.

*Id.* at 188, 110 S.Ct. 2793. To illustrate this possibility, the Court noted that the night clerk at a hotel had previously been found not to have possessed sufficient apparent authority for officers to have reasonably believed he could consent to a search of the defendant's room. *Id.* at 187, 110 S.Ct. 2793 (referring to *Stoner v. California,* 376 U.S. 483, 488, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)). Later, in *Georgia v. Randolph,* the Court stated that "a warrantless search of a shared dwelling for

evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. 103, 120, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

With this guidance from the Supreme Court, the Sixth Circuit has considered several cases concerning the apparent authority of a cohabitating girlfriend to consent to a search of her boyfriend's apartment, most of which have been decided in favor of the police. In *United States v. Gillis,* the Sixth Circuit found that the officers were reasonable in finding that Shaneska Williams, the defendant's live-in girlfriend, had apparent authority to consent to the search of the defendant's dwelling. 358 F.3d 386, 391 (6th Cir.2004). In addition to the officers' knowledge that Willams's name was on the lease, the court found that:

> [t]he officers did know that Williams had provided them with detailed information about the premises, including the locations where Gillis had drugs hidden on the property. They also had statements from Williams that she continued to reside at 1500 and that she had been at the residence earlier that same morning. Under these circumstances, the officers had enough information at the time of the search to reasonably conclude that Williams had apparent authority to consent.

*Id.* This was true even though there was some indication that Williams had departed from the residence several months earlier. *Id.* at 387–388.

In *United States v. Penney,* Devota Bowman had a six-year tempestuous romantic relationship with the defendant, which often brought the police to their dwelling. 576 F.3d 297, 301 (6th Cir.2009). After being separated for six months, the two reconciled the day before the incident.

*Id.* at 307. When Bowman arrived at the police station, she reported that the defendant had assaulted her and removed her from the house. *Id.* She also provided the officers information about narcotics in the dwelling. *Id.* at 308. Bowman accompanied the officers to the residence where she pointed out her personal possessions and helped the officers locate the contraband. *Id.* The Court found that officers reasonably believed that Bowman had apparent authority in light of the following facts: the officers were aware of the nature of the relationship with the Bowman and the defendant; Bowman indicated that she had moved back into the apartment; Bowman's account of the assault was supported by her appearance; Bowman provided information about the car that was parked at the residence as well as where the drugs were; and once inside the house, the officers observed Bowman was not merely an overnight guest in part because of the belongings that she gathered. *Id.* at 307–308. The court made this finding even though Bowman listed a different address on the complaint form, she had no key to the apartment, the officers did not investigate the names on the lease, and the defendant actually appeared at the police station to indicate that he had thrown Bowman out and did not want her to come back.

■ The Court finds that, on the scale of apparent authority, this case falls in between *Gillis* and *Penney.* The Magistrate Judge found that Mitchell had informed the officers that she had lived with Clay for a period of months. [R. 31 at 704] (citing Government's Hrg. Ex. No. 7). She told them that Clay had assaulted her and thrown her out earlier that day, and her appearance corroborated that story. [R. 31 at 698–99] (citing R. 25 at 12–14). She signed a consent form that identified the targeted premises as "my premises." [R. 31 at 704]. Further, she provided the officers with information as to the location

of Clay's drugs and guns. [R. 31 at 698–99] (citing R. 25 at 63–65). This is much of the same information available to the police in *Gillis,* and, like those officers, the Frankfort police officers were justified in relying on it as showing that Mitchell lived in the apartment and had apparent authority to consent to a search thereof. *See United States v. Hudson,* 405 F.3d 425, 442 (6th Cir.2005) (characterizing the court's earlier holding in *Gillis* as follows: "[w]e found apparent authority to exist largely on the basis of the girlfriend's statements that she lived at the defendant's apartment and was able to provide specific information about spots therein where the defendant hid drugs.").

Clay argues the officers should have had to investigate the situation further because ambiguity crept in when the officers learned that Mitchell did not have a key and that her name was not on the lease. For this proposition he cites *United States v. Waller,* which states that:

> [t]he government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" *United States v. McCoy,* Nos. 97–6485, 97–6486, 97–6488, 181 F.3d 105, 1999 WL 357749, at \*10 (6th Cir. May 12, 1999)

426 F.3d 838, 846 (6th Cir.2005). Notably, however, *Waller* says nothing of keys, leases, or even the consent to search someone's residence. In *Waller,* the Court found that, after the police had entered a residence, it was ambiguous whether third parties could consent to search of a brown

luggage bag that they admitted that they did not own. *Id.* In some ways, *Waller* works to show that the Frankfort police officers employed the correct procedure after they entered the Leawood apartment. When the officers encountered the locked closet door, they sought a warrant rather than extending the search beyond Mitchell's apparent authority. Had the officers in *Waller* approached the luggage bag inside the residence as the Frankfort police approached the closet, there would likely have been no constitutional violation.

■ The ambiguities that Clay cites— that Mitchell's name was not on the lease and that she did not have a key—have been previously found insufficient to categorically undermine apparent authority of a live-in girlfriend in situations similar to this. While the consenting third-party in *Gillis* did show that her name was on the lease, that is certainly no requirement for a finding of apparent authority. In determining whether a party lives on and has authority to consent to a search of the premises, "[n]o one fact, *such as who appears on the lease of a premises,* is determinative." *Hudson,* 405 F.3d at 442 (wherein the Sixth Circuit found that a third party possessed apparent authority despite the fact that the officers knew that her name was not on the lease) (emphasis added). Further, citing favorably to the opinion of the magistrate judge, the *Penney* court recognized that "it is a reality in today's world that consenting adults often co-habitat [sic] together without benefit of legal formalities-including those formalities relating to the establishment of property interests." *Penney,* 576 F.3d at 308. Under the same reasoning, the facts that the lease and the statements of a remote employee of the apartment complex do not reflect that the Clay and Mitchell are the tenants of record, do not render these circumstances ambiguous. This is especially true in light of the fact that Mitchell, a competent adult, admitted to living at

the residence and identified the location of the drugs and gun inside.

These circumstances are also not made ambiguous by the fact that Mitchell did not have a key to the residence. In *Gillis,* the defendant's girlfriend did not have a key to the outside doors of the residence, but the officers were still found to have reasonably judged her as possessing apparent authority to consent. 358 F.3d at 388. Moreover, as discussed, the live-in girlfriend in *Penney* neither had her name on the lease nor had a key to enter the residence. In that case the court made the logical point that a woman who had been assaulted and was vanquished from her dwelling might not have had the time or presence of mind to pick up a key before she left. Further, the court found that the cohabitating girlfriend in *Penney* had apparent authority to consent to a search of the residence even though the defendant appeared at the police station and informed the officers that he had thrown her out and did not want her to stay at his residence anymore. 576 F.3d at 301, 317. It would certainly be difficult to characterize the circumstances in this case as ambiguous when the Sixth Circuit found that those in *Penney* were not.

Clay argues that *Penney* is less ambiguous and distinguishable because the officers were familiar with the six-year on-again and off-again relationship of the defendant and the consenting cotenant. However, this fact cuts both ways. The case clearly indicates that the officers were aware that the defendant and his girlfriend lived in the apartment at issue when together, but they also were aware that she lived somewhere else when they were separated. *Id.* at 307. Thus, while the officers' historical knowledge of the relationship is a factor that suggested Bowman, the defendant's live-in girlfriend, might have authority over the residence, it is not

nearly the dispositive fact that Clay claims it to be. In fact, if this factor could be said to have any special meaning in *Penney*, it would largely be to explain why the police might have felt comfortable entering the dwelling on Bowman's consent when the defendant had appeared at the police station to inform them that he had thrown Bowman out and did not want her to come back. *Id.* at 309.

The Magistrate Judge concluded that the reasonableness of finding Mitchell to have had apparent authority is enhanced by the officers' findings at the apartment, which corroborated her statements. When the officers arrived at the residence, they noticed that the brown van described by Mitchell was parked in the parking lot. [R. 31 at 704] (citing Defendants Hrg. Ex. No. 2 at 66). Further, upon entering the apartment, the officers saw evidence that Clay had been sharing the apartment with a female and that there was, in fact, a locked closet door as Mitchell had described. [R. 31 at 700, 704, 706]. In Judge Wier's view, these facts assisted in corroborating the information provided by Mitchell and by showing her to be familiar with the residence in the way of someone who lived in and had authority over the premises.

Clay takes issue with the Magistrate Judge's consideration of the brown van [2] and Mitchell's personal belongings inside the residence because the searching officers were not able to use those as corroborating factors at the time that they entered the residence. In responding to this contention, the Court first notes that, while these facts are helpful, they are not necessarily essential to the apparent authority determination. Further, the Magistrate Judge appears to have found that

Mitchell had made the searching officers aware before they entered the apartment that she and Clay drove a brown van, which was, in fact, parked at the apartment when the officers arrived. [R. 31 at 704]. Since the Magistrate Judge viewed the witnesses and testimony first hand, the Court must give this finding great deference and uphold them unless they are clearly erroneous. *United States v. Valencia*, 3:11–CR–00159–H, 2012 WL 6043288 (W.D.Ky. Dec. 5, 2012) (citing *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir.2007)). The Court finds that the record could reasonably support the Magistrate Judge's conclusion that the searching officers would have been informed of the van and that finding it parked at the apartment would have given them increased confidence in the statement of Mitchell, just as it did the officers in *Penney*, 576 F.3d at 307 ("Bowman's car was parked outside the residence, consistent with her account of that morning's events.").

In addition, when the Magistrate Judge looks to the presence of Mitchell's possessions and the locked closet inside the apartment as additional evidence of her apparent authority, he is doing nothing that has not previously been endorsed by the Sixth Circuit. *See United States v. Grayer*, 232 Fed.Appx. 446, 449 (6th Cir. 2007) (Speaking of Jacqueline Clay, the defendant's live-in girlfriend, the Sixth Circuit panel stated, "[t]he room contained her personal effects. She had knowledge of the contents of the room when she pointed to a clothes hamper that hid the gun. Nothing in the record indicates that Clay consented to a search outside the scope of her authority, nor that the officers acted unreasonably when they relied on

---

**2.** Specifically, Clay argues that Mitchell only mentioned any information about the brown van to Officer Quire. In Clay's version of the facts, Officer Quire neither entered the apart-

ment nor told the other officers this information before they entered. Notably, this version of the facts appears to be contrary to the findings of the Magistrate Judge.

Clay's consent to search the back bedroom."); *Penney*, 576 F.3d at 308 (the defendant's live-in girlfriend "led officers through the residence and picked up her belongings from drawers, a laundry basket, and the washing machine, which she gathered into 'several bags.'"). While this may seem somewhat counterintuitive, information inside the apartment could be considered relevant to the apparent authority analysis because it reassures the officers as they search that they are not exceeding the scope of the area over which Mitchell had the apparent authority to consent to a search.

In summary, Mitchell's name might not have been on the lease and she did not have a key, but she did affirmatively represent that she had lived at the Leawood apartment with Clay for several months, and was willing to sign a form declaring it her premises. [R. 31 at 704] (citing Government's Hrg. Ex. No. 7). Further, Mitchell's appearance corroborated that she had been assaulted that morning and she was able to provide a description of where the contraband was in the apartment. [R. 31 at 698–99] (citing R. 25 at 12–14, 63–65). When the police arrived at the Leawood apartment they found the van Mitchell had described, and when they entered the residence, they uncovered the locked closet and evidence that someone else lived in the apartment besides Clay. [R. 31 at 704] (citing Defendants Hrg. Ex. No. 2 at 66); [R. 31 at 700, 704, 706]. Therefore, as has been the case in the overwhelming majority of these type of cases, it was reasonable for the Frankfort police officers to believe that Mitchell did live in the Leawood apartment and had apparent authority to consent to a search of the premises. *See Hudson*, 405 F.3d at 442 (citing *Rodriguez*, 497 U.S. at 183–84, 110 S.Ct. 2793) (emphasis omitted). The consistent findings of the Magistrate Judge are adopted and Clay's objection to the contrary is overruled.

**B**

Clay's objection to the Magistrate Judge's finding that probable cause was sufficiently shown in the affidavit to support a warrant may be more expeditiously resolved. The complete text of the warrant affidavit states as follows:

> Officers of the Frankfort Police Department investigated a domestic violence complaint at 803 Leawood Dr. Frankfort KY. 40601 # 12. The investigation led to the complainant of the domestic violence complaint advising that CLAY, Dono Demil was involved in trafficking controlled substances from the subject premises. The complainant, who lives in the apartment with Dono Demil Clay and has done so since February, 2013, gave consent to search the premises, and officers entered the premises and observed a locked closet in the rear bedroom. There was no key available for this locked closet. The complainant also advised that Clay usually keeps a firearm in the closet and cocaine in a top dresser. The security of the premises has been maintained until the same can be searched pursuant to a search warrant. It is reasonably believed based on the foregoing the foregoing [*sic*] that search of the subject premises will result in the collection of evidence of drug trafficking.

[R. 31 at 700]. Clay argues that the warrant is constitutionally insufficient because "the information presented to the state court judge was only a generalized representation by an unnamed person whose veracity the police had no cause or capacity to affirm or corroborate." [R. 33 at 13].

In determining the sufficiency of an affidavit, a court must determine, "whether the magistrate judge had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *Unit-*

ed States v. Woosley, 361 F.3d 924, 926 (6th Cir.2004) (citing *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). As affidavits are often drafted by "nonlawyers in the haste of a criminal investigation," the Supreme Court has recognized that, "technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Instead, "the affidavit should be reviewed in a commonsense rather than hypertechnical manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause rather than engaging in line-by-line scrutiny." *Woosley*, 361 F.3d at 926 (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir.2001)). In making this determination the court should give "great deference" to the magistrate's probable cause determination, which should be "reversed only if the magistrate arbitrarily exercised his discretion." *Id.*

■■ Clay's argument that this warrant affidavit does not survive substantial basis review is predicated on the fact that the warrant does not disclose Mitchell's name to the magistrate, and that the affidavit is devoid of any specific information to corroborate Mitchell's representation s.[3] However, the fact that an informant is not named in the warrant affidavit "is not fatal to the establishment of probable cause." *United States v. Caldwell*, 114 Fed.Appx. 178, 181 (6th Cir.2004) (citing *United States v. Davidson*, 936 F.2d 856 (6th Cir. 1991)). "[T]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or in what a critic might say

should have been added." *Woosley*, 361 F.3d at 924 (citing *United States v. Allen*, 211 F.3d 970 (6th Cir.2000) (en banc)). Even if the state magistrate judge was not provided with significant information about Mitchell's reliability, the affidavit could still be constitutionally valid if it includes "sufficient corroboration that the state court judge could determine, under the totality of the circumstances, that probable cause existed." *Id* at 927.

■ In this case, the warrant affidavit prepared by the Frankfort police officers and signed off on by the Frankfort County Attorney includes sufficient corroboration to support a finding of probable cause by the state magistrate judge. Counter to the representations of Clay, this is no anonymous tipster case where an unknown source provides the police with a nebulous report that crime might be happening in some nearby place. This affidavit makes clear that an adult indicated to the police that the defendant was engaged in drug trafficking in the apartment that they lived in together. As a result, it would have been plain from the face of this warrant affidavit that the informant would have had intimate knowledge of the activities of the apartment and the illicit contents of the closet. Moreover, the informant associates contraband with the locked closet that the police found upon entry and for which the police were seeking a warrant to search. Even Clay, who attempted to have this portion of the affidavit excluded, admitted that this information "provided some corroboration to that unidentified source and buttressed her credibility." [R. 33 at 14]. Because of the Court's previous finding that no portion of the warrant affi-

---

3. In his motion to suppress, Clay also argues that the officers conducted the search before they procured the warrant. Though Clay's factual recitation implies that he takes some issue with the Magistrate Judge's chronology, he does not advance a specific objection to

the Recommended Disposition on this ground. As such, the Court need not engage in a *de novo* review of the Magistrate Judge's conclusion on that issue herein. *See Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir.1986).

davit need be excised due to an unconstitutional entry of the apartment, Clay's argument on this point is weakened. The Court agrees with the Magistrate Judge that, while the warrant is no model of excellence, it did provide a substantial basis for the state magistrate judge's conclusion that the officers had probable cause to search the locked closet in Clay's apartment. [*See* R. 31 at 709–10]. Clay's objection to the contrary is overruled.

Finally, it should be noted that Clay also argues that the good faith exception to the exclusionary rule does not apply to allow the officers to conduct a search in the absence of a valid warrant. However, as the Court has found that the Frankfort police officers had apparent authority from Mitchell to enter the Leawood apartment and that they did secure a valid warrant to conduct the search of Clay's locked closet, no discussion of the good faith exception is necessary.

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendant's Objections to the Magistrate's Report and Recommendation [R. 33] are **OVERRULED;**

2. The Magistrate Judge's Recommended Disposition [R. 31] is **ADOPTED** as and for the opinion of this Court; and

3. The Defendant's Motion to Suppress [R. 20] is **DENIED.**

### RECOMMENDED DISPOSITION [1]

ROBERT E. WIER, United States Magistrate Judge.

The Court assesses a motion to suppress filed by Defendant, Donald Demil Clay. DE # 20 (Motion). Clay faces cocaine trafficking and firearm charges related to alleged conduct in Franklin County on April 23, 2013. DE # 1 (Indictment). The suppression motion challenges a search of Defendant's then-residence by Frankfort police. Movant complains that the charges result from an unconstitutional search. The United State responded in opposition. DE # 23 (Response). On October 28, 2013, the Court conducted a lengthy evidentiary hearing and received concluding oral argument on October 31, 2013.

The case requires the Court to evaluate the validity of a search consent given by Defendant's then live-in girlfriend, Kendra Mitchell. Additionally, the Court must determine whether the subsequent search of a locked bedroom closet was warranted and, if so, whether the four corners of the warrant survive substantial basis review. The Court finds that Mitchell had apparent authority to consent to a search of the Leawood apartment. Additionally, Frankfort police searched the locked closet pursuant to a valid warrant. The Court recommends denial of the motion to suppress.

### I. Hearing and Arguments

The Court encounters and has fully analyzed an extensive record. The record includes the parties' briefing, DE ## 20, 23, as well as the hearing and exhibits. The hearing, transcribed at DE # 25, featured testimony from Sergeant Chris Quire, Lieutenant Stephen Sutton, and Detective Robert Courtney, Jr., of the Frankfort police. Kendra Mitchell, John Goode, Mary Foster, and Shawn Gross also testified as civilian witnesses.

Early in the morning of April 23, 2013, Clay and Mitchell, who were in a relationship, argued at the apartment they shared, 803 Leawood Drive, Apartment 12, Frank-

---

1. District Judge Van Tatenhove referred the motion for a recommendation. DE # 21 (Order).

fort, Kentucky. DE # 25 (Trans.) at 12. Clay first wanted Mitchell to leave. As Mitchell left, Clay allegedly tried to pull her back into the dwelling from the parking lot by grabbing her feet and knocking her down. Mitchell screamed for help (through Clay's hands covering her face) until neighbors came outside. *Id.* at 12–13, 64; Government's Hrg. Ex. No. 1. Mitchell escaped and went to her grandmother's house, where she called Frankfort police. DE # 25 (Trans.) at 13–14. At officer request, Mitchell traveled to Frankfort police headquarters, where she first met with Sergeant Quire. *Id.* at 14, 63.

Upon encountering Mitchell, Quire noticed marks on her face. *Id.* at 63. Per Quire, Mitchell stated she was tired of Clay's aggressive behavior and wanted to "talk about the drugs that [Clay] had at the apartment on Leawood." *Id.* at 63. Mitchell also expressed her desire to press charges for the alleged assault. After briefly speaking with Quire, Mitchell completed a witness statement, *see* Government's Hrg. Ex. No. 7, and Quire involved his superior, Lieutenant Sutton. Mitchell advised both officers that Defendant had "some drugs and a gun in a locked room or a closet . . . in the back bedroom." DE # 25 (Trans.) at 65. Lieutenant Sutton perceived the situation as a "significant case" and called officers from the department's "flex" or narcotics unit, i.e., Sergeant Frazee and Detective Courtney. *Id.* at 135.

Mitchell represented that Clay might still be at the residence and requested officer assistance in removing her personal belongings from the area. *Id.* at 136. In order to assure Mitchell's safety, and with an intent to arrest Clay on probable cause for the alleged assault, Quire drove Mitchell to the Leawood address. *Id.* at 65, 136. Sutton, along with Sergeant Ebert, traveled to the apartment separately; Officer Roberts met them on scene. *Id.* at 138, 143. At the residence, Mitchell remained in Quire's patrol car and had signed a consent to search form.[2] *See* Government's Hrg. Ex. No. 1. Quire testified that Mitchell was "very upset," "emotional," and "hiding in the back of the cruiser." DE # 25 (Trans.) at 66.

Sutton, Ebert, and Roberts knocked and announced themselves but received no answer; they heard a television in the background. *Id.* at 144. Mitchell had consented to the search but did not provide a key. Lieutenant Sutton contacted Peach Rentals, the management company for the apartment complex, which dispatched a maintenance employee, John Goode. Goode provided officers with a key and left the apartment but remained at the complex doing other work. *Id.* at 214. Sutton, Ebert, and Roberts unlocked unit 12, again announced their presence, and performed a safety sweep of the residence. *Id.* at 144. Neither Clay nor anyone else was present at the apartment. *Id.* 145. Officers encountered a locked closet[3] in

---

**2.** For safety purposes, Quire and Mitchell parked and waited around the corner from the apartment. At some prior point, Mitchell told Quire that Clay drove a brown Pontiac van, which Quire identified upon arrival in the parking lot. *Id.* at 65–66.

**3.** The record is not fully consistent as to when officers first learned of the presence of the locked closet. Mitchell denied telling law enforcement about the locked closet prior to the initial entry and safety sweep, *id.* at 14, 16,

but Quire indicated that, during the initial interview, Mitchell advised that Clay had "some drugs and a gun in a locked room or a closet that he had made in the back bedroom." *Id.* at 65. Quire later testified that Mitchell told him that Clay kept the contraband in the closest after the pair returned to the police station following the initial apartment entry. *Id.* at 67. Lieutenant Sutton testified that Mitchell had advised officers of the locked closet before agents entered the apartment. *Id.* at 169.

the bedroom, as well as a marijuana pipe and a CD with white powdery residue in plain view on top of a bedroom dresser. *Id.* at 145–46. Sutton confirmed with the maintenance man that the deadbolt on the closet was not standard issue, and Mitchell advised officers that Clay himself had installed the lock just days prior. *Id.* at 147. Based on the pipe and white residue, as buttressed by Mitchell's statements, which Sutton considered "pretty reliable," officers decided to seek a search warrant for the closet. *Id.* at 147–48. Sutton, Ebert, and Roberts secured and remained on the scene while Quire and Mitchell returned to police headquarters. The officers were outside, with Roberts guarding the door.

Quire requested Detective Courtney's assistance in applying for a search warrant, and Courtney met Quire at the station. *Id.* at 68. Quire drafted the affidavit at Courtney's computer. *Id.* at 67. Larry Cleveland, Franklin County Commonwealth's Attorney, reviewed the warrant and warrant application at the police department, initialed the documents to indicate his approval; Quire then took the warrant to the court for evaluation. *Id.* at 68, 174; *see also* Government's Hrg. Ex. Nos. 2–3 (reflecting the initials "LC"). The warrant affidavit states:

> Officers of the Frankfort Police Department investigated a domestic violence complaint at 803 Leawood Dr. Frankfort KY. 40601 # 12. The investigation led to the complainant of the domestic violence complaint advising that CLAY, Dono Demil was involved in trafficking controlled substances from the subject premises. The complainant, who lives in the apartment with Dono Demil Clay

and has done so since February, 2013, gave consent to search the premises, and officers entered the premises and observed a locked closet in the rear bedroom. There was no key available for this locked closet. The complainant also advised that Clay usually keeps a firearm in the closet and cocaine in a top dresser. The security of the premises has been maintained until the same can be searched pursuant to a search warrant. It is reasonably believed based on the foregoing the foregoing *[sic]* that search of the subject premises will result in the collection of evidence of drug trafficking.

Government's Hrg. Ex. No. 2.

Special Circuit Court Judge Reed Rhorer signed the warrant and warrant application at approximately 10:15 a.m. Government's Hrg. Ex. Nos. 2–3; DE # 25 (Trans.) at 85. Quire further sought, and Judge Rhorer signed, a criminal complaint and arrest warrant for Clay, charging assault 4th domestic violence (minor injury). Government's Hrg. Ex. No. 8. All signatures by Judge Rhorer occurred as part of the same interaction. Quire telephonically advised other officers that he had obtained the search warrant, and he then took the warrant directly to the Leawood Drive residence. *Id.* at 76. Detective Courtney and Sergeant Frazee arrived on scene at approximately the same time. Quire then returned to police headquarters to advise Mitchell on protective order protocol.[4] *Id.*

Upon the warrant's arrival, Lieutenant Sutton contacted Goode about opening the locked closet door to avoid forcing entry and causing property damage. Goode re-

---

4. Whether Quire personally participated in the search of the Leawood apartment is disputed. Quire denied personally participating in the search, *id.* at 76, 80, but the warrant return indicates that Quire recovered approximately 18 grams of suspected cocaine from underneath a couch cushion. Government's Hrg. Ex. No. 3. Detective Courtney, the officer responsible for logging the evidence, testified that Quire picked up a couch cushion, revealing the suspected cocaine. DE # 25 (Trans.) at 202. The discrepancy is not, on this record, dispositive as to any issue.

turned to the apartment, popped the closet door pins out, and officers removed the door. *Id.* at 149–50, 216–17. Goode then left the apartment and was not present during the search. *Id.* at 149–50, 216–17.

Detective Courtney logged evidence while Sergeant Frazee and others conducted the physical search of the premises. *Id.* at 179. To log evidence, Courtney took the item, placed it in an evidence bag, and marked on the bag who found the item and discovery location. *Id.* at 192. Regarding the recorded time of discovery, Courtney consulted the official dispatch log and used the generic arrival time (here, 10:31 a.m.) as the default time of discovery. This was his custom. The search revealed (1) approximately 19 grams plus 3 ounces of suspected cocaine, (2) approximately 7.5 grams of suspected marijuana, (3) 2 unidentified yellow tablets, (4) scales, plastic baggies, 1 spoon, a rolled dollar bill, and a 3 key, (5) $530 total United States currency, (6) 7 cell phones, and (7) a silver Jennings handgun loaded with 6 rounds of ammunition and a magazine clip, in addition to other miscellaneous items. Government's Hrg. Ex. No. 3. After completing the search, officers left the Leawood apartment.

At some point during these events, law enforcement made contact with Mary Foster at Peach Rentals.[5] During that phone call, Foster advised officers that Shawn Gross was the titular lessee. *Id.* at 232. Foster denied to police that Clay currently lived in the apartments. *Id.* at 235. Per Foster, Clay had previously lived at 803 Leawood Drive # 11 but had been evicted for nonpayment. Government's Hrg. Ex. Nos. 12. Foster stated that, as of February 2013, Clay owed a past-due balance on rent and was not eligible to rent an apartment from Peach Rentals. DE # 25 (Trans.) at 223. The Court notes that Foster was in a remote location and could only relate what the records of the property owner showed.

Following the April 23, 2013 events, Mitchell and Clay broke up for approximately two weeks. *Id.* at 35. The couple got back together, remaining romantically involved until both were arrested during a later traffic stop. *Id.* at 35. At arrest,[6] Mitchell lied to local police and took responsibility for the firearm. *Id.* at 30. At this Court's hearing, however, she denied placing the gun or the drugs into the closet. *Id.* at 31.

A federal grand jury indicted Clay on June 27, 2013. DE # 1 (Indictment). Count one charges possession with intent to distribute a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1). Count two alleges that Clay knowingly possessed a firearm in furtherance of the drug trafficking crime charged in count one, in violation of 18 U.S.C. § 924(c)(1), and count three charges Defendant with possessing a firearm after having been convicted in a court of a crime punishable by imprison-

---

5. The exact time officers contacted Foster is unclear. Foster could not remember precisely when she advised the police that Clay was not the nominal lessee. *Id.* at 233 ("I don't recall exactly how it all happened."). Both Quire and Sutton denied having knowledge of the named leaseholder, *see id.* at 103, 158, although Foster allegedly communicated to someone that Clay was not the lessee prior to sending Goode to open the front door. *Id.* at 234. Foster also indicated that the police advised her office that afternoon that Clay

was living at the apartment, although she did not remember exactly when. *Id.*

6. Mitchell was arrested and ultimately charged with possession of cocaine at the Franklin County Detention Center. As of October 31, 2013, Mitchell had pled guilty to and was awaiting sentencing on the offense. *Id.* at 50. Hon. Londa Atkins, Mitchell's counsel for the state cocaine possession charge, represented Mitchell during the evidentiary hearing.

ment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). *Id.* All counts center on the April 23 Frankfort apartment search. *Id.*

Per Movant, Mitchell did not have actual or apparent authority to consent to the April 23 search of 803 Leawood Drive, Apartment 12. He also claims a constitutional violation in the search of the locked bedroom closet and seeks suppression of seizure fruits. DE # 20 (Motion). The United States defends Mitchell's consent authority under the doctrines of both actual and apparent authority, further defending the closet search as validly warranted. DE # 23 (Response).

## II. Analysis

*A. Mitchell did not have actual authority but did have apparent authority to consent to a search of 803 Leawood Drive, Apartment 12.*

■ "Consent" is an exception to the Fourth Amendment warrant requirement. The Sixth Circuit stated the relevant authority in *United States v. Hunyady,* 409 F.3d 297 (6th Cir.2005):

In *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court reaffirmed the principle that

a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of "unreasonable searches and seizures" if the officers have obtained the consent of a third party who possesses common authority over the premises. *Id.* at 179, 110 S.Ct. 2793. The Court has further held that "common authority" is not to be implied from concepts of property law, "but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in

his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock,* 415 U.S. 164, 171–72 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

*Hunyady,* 409 F.3d at 303. Even absent actual authority, under Matlock, a person's apparent authority supports a warrant exception:

And even if [the] third party does not in fact possess common authority over the property searched, this court has determined that "the Fourth Amendment is not violated if the police relied in good faith on a third party's *apparent* authority to consent to the search." *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir.2004) (relying on *Rodriguez,* 110 S.Ct. 2793) (emphasis added). **"Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search."** *Gillis,* 358 F.3d at 390–91 (citations omitted).

*Hunyady,* 409 F.3d at 303–04 (emphasis added).

The United States generally bears the burden of proving consent. Thus, the Government must establish "by a preponderance of the evidence, . . . through clear and positive testimony that . . . valid and voluntary consent to the search was obtained." *United States v. Davis,* 283 Fed. Appx. 370, 373 (6th Cir.2008) (quoting *United States v. Worley,* 193 F.3d 380, 385 (6th Cir.1999)). There is no issue here as to voluntariness, but the Government likewise must "bear[ ] the burden of establishing the effectiveness of a third party's consent." *United States v. Waller,* 426 F.3d 838, 845 (6th Cir.2005) (citing *Rodriguez,* 110 S.Ct. at 2796).

The key is whether Mitchell, who did consent, had actual or apparent authority to do so.[7] The Court does not, on this record, find actual authority to consent; Mitchell did not generally have joint access to or control of the residence for most purposes at the time of consent. Mitchell did not possess a key to the shared apartment on April 23, 2013, nor had she ever possessed a key. DE # 25 (Trans.) at 34. Mitchell was not a lessee of the apartment. *Id.* at 227.

Mitchell clearly resided at the Leawood apartment with Clay up until April 23, 2013. *Id.* at 7 (describing the couple moving from a prior shared apartment to the Leawood Drive apartment); *id.* at 8 (confirming that she lived with Clay at Leawood Drive during the morning events of April 23, 2013); *id.* at 18–19 (noting that she kept personal items for herself and her child at the Leawood apartment); *see also* Government's Hearing Ex. No: 7 ("I lived there with him since February 2013."). Critically, however, to the question of actual authority, she no longer considered herself a resident of the apartment as of the time she completed the incident report and gave consent to search on April 23, 2013. DE # 25 (Trans.) at 56 ("Because at the time when I wrote the statement I didn't live there anymore."); *id.* at 58 ("Q: Okay. And in your mind at the time you wrote this and at the time you were speaking with the police, even you no longer considered yourself to have any right to go in and out of that apartment; right? A: Right."). Indeed, Mitchell, who bagged up and removed most of her belongings, in-

tended to vacate the residence and live with her grandmother. *Id.* at 22; 56. Plainly, Mitchell internally did not consider herself to have lawful entry rights into the apartment when she gave law enforcement consent to search. She had vacated the residence with no intent to return. On that, her testimony now is unequivocal.

Additionally, the record indicates that Mitchell always considered the residence to be primarily Clay's. *Id.* at 55–57 (discussing her written victim statement); *see also* Government's Hrg. Ex. No. 7 ("He keeps cocaine and guns in **his** apartment." (emphasis added)). Mitchell also admitted that, at times, she stayed not with Clay at the Leawood apartment but with her grandmothers. *Id.* at 48–49 ("Q: ... "Sometimes you stayed with [Clay], but most of the time you lived and stayed at your grandmother's house on Logan Street; is that correct? A: Yes. I'm there and at my other grandmother's house. If I wasn't staying with him, that's where I would stay. Q: And you, while you were at Mr. Clay's, recognized that it was his place and respected his privacy; correct? A: Yes.").

Prior to giving authorities consent to search the apartment, Mitchell determined to move out of the apartment. She removed some belongings from the home and put them in a dumpster, *id.* at 22 ("Because I didn't want to carry [my things] while I—when I walked home [to my grandmother's house])," and did not intend to return to the home as a resident. Thus, when signing the consent to search form, Mitchell could not and did not, by

---

**7.** The United States established that Mitchell acted voluntarily, and the defense does not advocate to the contrary. Quire and Sutton both testified that Mitchell executed a consent to search form on site at Leawood, which reinforces the voluntariness of the grant. Nothing in the record suggests that Quire or Sutton's portrayal—which included helpful and cooperative behavior by Mitchell—result-

ed from other than her voluntary decisions to permit consent and to assist authorities on the day in question. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (outlining voluntariness analysis). Mitchell sought police involvement and initiated police presence at and entry into the apartment.

her own testimonial description, have "common authority" over Leawood Drive # 12.

Importantly, Frankfort police did not encounter such clarity on the day in question. Indeed, the Court finds that Mitchell displayed apparent authority to consent. Mitchell told police that she had lived with Defendant since February 2013. *Id.* at 64 (Sergeant Quite testifying that "[s]he said she lived with Mr. Clay on Leawood since February of this year."); Government's Hearing Ex. No. 7 ("I lived there with him since February 2013."). The catalyzing assault allegedly began in the home in the early morning when Mitchell had been asleep at the apartment. *See* Defendant's Hrg. Ex. No. 2 (JC–3 Report). She willingly signed the consent form, which labeled the apartment "my premises." When Quire and Mitchell arrived at the Leawood Drive apartment and she executed a consent to search, Quire saw the brown van in the parking lot that Mitchell had previously described. *Id.* at 66. Further corroborating her ties to the residence, Quire noted a broken cell phone in the parking lot consistent with Mitchell's story of the altercation. *Id.* at 75. Additionally, Quire testified that he had no information to contradict or any reason to doubt her claim that she lived at Leawood with Clay. *Id.* at 69, 74, 102. Lieutenant Sutton testified similarly, noting that, upon entering the residence during the initial protective sweep, he saw nothing to contradict her claims or to indicate that two people did not live at the apartment. *Id.* at 167. The apartment showed evidence of at least two inhabitants, one of which was female. *See* Government's Hrg. Ex. No. 6–C (photo showing pink hair clip), 6–D (photo of bathroom with 2 toothbrushes). Sutton also saw the broken cell phone outside, corroborating Mitchell's presence at and connection to the home. *Id.* at 165. Lieutenant Sutton considered Mitchell's information "reliable." *Id.* at 148.

In *United States v. Penney*, 576 F.3d 297, 308 (6th Cir.2009), the Sixth Circuit affirmed a live-in girlfriend's general authority to consent to search: "We have confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabitates with a boyfriend." *Id.* (citations omitted). Like Mitchell, Penney's girlfriend, Devota Bowman, provided law enforcement with information pertaining to alleged drug trafficking while filing an assault complaint. Bowman told officers that the couple had been cohabitating at the time of the incident and that Penney had kicked her out of the residence before she could gather her personal belongings. Although Penney actually showed up at police headquarters to ensure Bowman not return to his home, Bowman gave consent to search, and agents accompanied Bowman back to the residence. Bowman did not possess a key but finagled the back door and led officers through the home, pointing out contraband while collecting her own items. She provided officers with specific information regarding the location of contraband. *Id.* at 307–08.

The Sixth Circuit confirmed that "the facts known to [officers] warranted men 'of reasonable caution in the belief that the consenting party had authority over the premises.'" *Id.* at 308 (quoting *Rodriguez*, 110 S.Ct. at 2801). Specifically, and relying on its holding in *Gillis*, the court noted that "cohabitation need not be uninterrupted to support a reasonable belief in common authority." *Id.* In *Gillis*, the Court affirmed a girlfriend's apparent authority to consent to a search of her boyfriend's premises even though officers knew she (1) had left the home several months prior; (2) did not possess all keys to the residence; and (3) resided at another address at the time she gave consent. *Gillis*, 358 F.3d at 391. There, officers possessed a reasonable belief that the girl-

friend could consent to search because she advised officers that she lived at both residences, had been at the residence in question the morning she provided consent, and gave detailed information about the property, including where the defendant allegedly hid drugs. *Id.*

Certainly, the record tells a story that, like life, is fluid and imperfect, and the Court has carefully parsed the proof. Mitchell did not possess a key to the apartment and could not remember if she advised officers of same. DE # 25 (Trans.) at 49. Clay kicked her out of the apartment **prior** to the act of consent, and she advised officers that she planned to stay with her grandmother. Mitchell further testified that she generally had lived intermittently with her grandmothers. Finally, officers may have been on notice that Clay was not a nominal lessee before Goode opened the apartment.

However, the weight of Sixth Circuit authority convinces the Court of Mitchell's apparent authority. Bowman, like Mitchell, provided a different address on her complaint. *Penney,* 576 F.3d at 308–09. In considering the issue, the Sixth Circuit stated: "The bare fact that Bowman listed her mother's address on her complaint form is not dispositive: the absence of formalized property rights does not automatically translate into the absence of common authority." *Id.* (quoting *Matlock,* 94 S.Ct. at 993 n. 7). Here, Mitchell claimed presence and continuing domicile at the residence the morning of the alleged assault. Clay allegedly woke Mitchell up in the pre-dawn hours and began arguing with her, and she tried to leave while under assault. Indeed, Officer Sutton advised that Mitchell provided the Logan Street address on the assault complaint because she was going to live there prospectively and because it was the address where officers could reliably later reach her. DE # 25 (Trans.) at 158.

As in *Penney* and *Gillis,* Mitchell did not have a key, but key absence was not a concern to the officers. *See id.* at 74 (Sergeant Quire assumed the key may have been lost in the struggle); *id.* at 166 (Lieutenant Sutton denying concern over lack of a key and stating: "I know the assault case hasn't been adjudicated yet, but if you listen to the facts of the victim saying she's being physically assaulted, I'm sure she's probably not worried about where her key is at the time. She's trying to get away to protect herself."). Further, Mitchell gave officers specific information regarding the location of a gun and drugs, and also regarding the van the couple used for transportation. *Id.* at 66 (Quire recognizing van when arriving at Leawood with Mitchell). Quire had no information to contradict that she lived there, *id.* at 69, and, upon entering the apartment, Sutton saw nothing to contradict that two people lived there. *Id.* at 167.

Clay would argue that ambiguities in the scenario called for further police inquiry. *See Waller,* 426 F.3d at 845 ("The government cannot establish that its agents reasonably relied upon a third party's apparent authority 'if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry.'" (quoting *United States v. McCoy,* 181 F.3d 105, *10 (6th Cir.1999) (table))). The Court views the situation as one without ambiguity. The question turns on what the officers confronted at the time. *See id.* at 846 (citing *Rodriguez,* 110 S.Ct. at 2801). Even if authorities knew from Peach Rentals that Gross was on the lease, the cases readily recognize that lessee status is hardly determinative of whether a per-

son truly has access to a location. As the ultimate facts here demonstrate, Shawn Gross had the property interest, but Dono Clay and Kendra Mitchell lived in Apartment 12. The police had information from an obviously assaulted female (*see* Government's Hrg. Ex. No. 7) indicating that she had lived for over two months in the apartment. She, at that point, under stress and in crisis, wanted a safe place and indicated her next abode would be with a grandmother. Relationships of cohabitation, especially those featuring violence, crime, and substance abuse, commonly present blurred lines (as the prompt reconciliation of Mitchell and Clay typifies). Police here quite reasonably focused on Mitchell's objective story, corroborated through her physical state, the locational indicia (van, phone), and apartment confirmations (evidence of habitation by two residents, including a female). With *Penney* and *Gillis* setting the standard in the Sixth Circuit, the United States prevails as to apparent authority.[8]

**B. Officers conducted a warranted search of the locked bedroom closet at 803 Leawood Drive, Apartment 12.**

Clay also alleges that Frankfort police searched the locked closet **before** securing a warrant. DE # 20–1 (Memorandum) at 4–5. The United States asserts that the search was warranted, as more fully developed at the hearing. DE # 23 (Response) at 8–9. The lynchpin of Defendant's argument is search timing relative to warrant procurement. Judge Rhorer signed the warrant at 10:15 a.m. on April 23, 2013. Government's Hrg. Ex. No. 3. However, the evidence seizure log, as reflected in Defendant's Hrg. Ex. Nos. 3–5, reflects that officers seized items one and two at 10:31 a.m. but items three through nineteen **at 9:30 a.m.**[9] Several of items three through nineteen reflect collection from the bedroom closet.

Sergeant Quire testified to the accuracy of the warrant date and time, DE # 25 (Trans.) at 70, and denied any knowledge of officers conducting a search prior to obtaining the warrant. Detective Courtney personally accepted responsibility for the difference in times on the paperwork: "[T]hat's got to be my fault. I don't know why it would—I know for a fact that I logged in all the evidence together, and it was the same evidence we took out of there all at once. But that's my fault. I don't know why it would default to 9:30. It could have been—once I made that mis-

8. The Court continues to struggle with what a finding of no authority would actually signify in this case. As the analysis in part B shows, the Court rejects the defense postulate that police searched the locked closet in advance of warrant issuance. Thus, the warrant was the basis for the full apartment search, including the critical closet access where a gun and most of the cocaine was found. The earlier entry did yield observation of a marijuana pipe and possible cocaine residue, but none of that contraband appeared in the warrant application. Further, the sweep premised on consent did confirm the locked closet, but Quire and Sutton both testified that Mitchell referenced the locked closet in advance of the first entry. The Court finds that the weight of the evidence indicates that Mitchell did men-

tion the closet before the first entry. As a result, there simply is nothing from the consent-based entry, at least, nothing of consequence to the charges, that would be subject to a fruits or suppression analysis, in the Court's view.

9. Detective Courtney testified that, when logging seized evidence, he documents the person collecting the evidence and the location found. In logging time, however, Courtney uses the dispatch log as a universal, generic time. DE # 25 (Trans.) at 192. Thus, because the dispatch log shows his arrival time as 10:31 a.m., that is the time he would have marked as the evidence collection time. *Id.;* see also Government's Hrg. Ex. No. 9.

take one time, then all of those times are going to change ... on our software." *Id.* at 193. Courtney explained that he likely entered 9:30 as a typo, and that the software thereafter defaulted to the incorrect time. *Id.* When questioned specifically about the time, Courtney reiterated that "I made a mistake." *Id.* at 194.

As a factual matter, the Court finds that officers did not enter the closet until after receiving the search warrant. Detective Courtney committed a clerical error in preparing the evidence log, which he then appended (in different forms) to the various police reports. Officers Sutton and Courtney denied entering the locked closet prior to securing the warrant, *see id.* at 150, 195, 206. Judge Rhorer signed the warrant at 10:15 a.m., which corroborates the timeline to which Quire, Sutton, and Courtney testified. The officers testified sincerely, and the defense offered no proof, other than the evidence log, to support a finding that law enforcement did not conduct a warranted search of the closet. The dispatch records and consistent testimony compel this conclusion.

The Court notes but ultimately rejects Defendant's arguments that (1) based on the default nature of the system, Detective Courtney did not need to type in a time after entry one; (2) Detective Courtney testified that officers began the search in the back bedroom, but item number 2 was located in the living room; (3) the dispatch logs are inconsistent; and (4) Goode testified that he opened the closet approximately 30 minutes after initially letting officers into the apartment, which, by his timeline, would have been around 9:30 a.m. Detective Courtney testified that he made an error, and all evidence points to him not reaching the scene until 10:31 a.m. Further, although officers may have begun the search in the locked closet, the Court does not doubt the fluidity of the situation, with multiple officers spread over the apart-ment. It is hardly surprising that officers scattered about would uncover items in a less-than-compartmentalized fashion. That Courtney first logged an item from the closet and then logged an item from the living room is unremarkable. Finally, although Goode testified sincerely, he only estimated the timing of his actions on that day. Additionally, Goode likely had more than two instances of interaction. He first let the police in, but he later answered questions from Sutton about whether the closet lock was standard. Later, when police actually got the warrant, Goode returned to spare the apartment from damage and pop the closet door from its hinges. *Id.* at 147, 149 (Sutton testifying about multiple contacts). It is plausible that Goode, a disinterested observer, simply compressed or reordered events. The objective dispatch logs have recall superior to any of the mortals, and they plainly support the Government's proffered chronology. Closet entry followed warrant issuance.

### C. The warrant survives substantial basis review.

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990). To determine probable cause, an issuing magistrate must examine the totality of the circumstances and find "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins,* 396 F.3d 751, 760 (6th Cir.2005) (quoting *United States v. Bowling,* 900 F.2d 926, 930 (6th Cir.1990)). A supporting affidavit must sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence

sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir.1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing judicial officer's determination. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir.2006). Such deference ensures than "an issuing [judge's] discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir.2000). The reviewing court must uphold the issuing judge's probable cause determination if a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *Allen*, 211 F.3d at 973.

Additionally, line-by-line scrutiny of the supporting affidavit is inappropriate, *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir.2006) (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir.2004)), and the reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." *Id.* at 306; *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir.2005). When the search at issue occurred pursuant to a warrant, the defendant has the burden of establishing a prima facie case that the search was illegal. *United States v. Murrie*, 534 F.2d 695, 697–98 (6th Cir.1976); *see also United States v. Franklin*, 284 Fed.Appx. 266, 275 (6th Cir.2008) (Clay, J., dissenting).

Defendant's argument relative to the sufficiency of probable cause to issue the warrant, at least as articulated in his motion, rests on the assumption that officers conducted a warrantless search of the closet and misled the issuing judge regarding the entry chronology. DE # 20–1 (Memorandum) at 4–5. During oral argument,

Clay also raised staleness as a concern. The Government defends the warrant as sufficient and issued on probable cause.

As a factual matter, the Court has already determined the warrant preceded the search of the closet. This forecloses Clay's central theory. The Court does have a concern over the (lack of) identification of Mitchell in the application. The warrant affidavit does not name Mitchell; Sergeant Quire simply refers to the "complainant." Clay thus argued that the Court should view Mitchell more like a tipster than a known individual. The United States alleged that officers did not intend to keep Mitchell's identity a secret and that they simply did not identify her by name.

The Sixth Circuit does not rigidly require that a confidential informant be "named to the magistrate" in order for a judge to find probable cause. *United States v. Woosley*, 361 F.3d at 926 n. 4 (quoting *Allen*, 211 F.3d at 970; *United States v. Caldwell*, 114 Fed.Appx. 178, 181 (6th Cir.2004) ("The fact that the informant in this case was not named to the judge issuing the search warrant, moreover, is not fatal to the establishment of probable cause." (citations omitted))). Indeed, an affidavit containing a tip from a source previously proven reliable may "support a finding of probable cause in the absence of any corroboration." *Id.* at 926–27 (citing *Allen*). "Alternatively, an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *Id.* (citing *Gates*). The Court must thus determine whether "the instant affidavit, which contains little basis for the state court judge to assess independently [Mitchell's] credibility, otherwise includes sufficient corroboration that the state court judge could determine, under the

totality of the circumstances, that probable cause existed." *Id.* at 927.

To be clear, the affidavit at issue could have simply identified Mitchell by name. But, an affidavit " 'is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.' " *Id.* (quoting *Allen,* 211 F.3d at 975). Here, Quire's affidavit identifies a domestic violence complainant as the individual providing information about Clay's alleged drug trafficking and further characterizes the complainant as residing at the Leawood residence since February 2013. Government's Hrg. Ex. No. 2. Additionally, the affidavit attributes specific information to the complainant regarding the locations of a gun and drugs in the home. *Id.* The instant affidavit plainly provides a " 'nexus between the place to be searched and the evidence sought.' " *United States v. Laughton,* 409 F.3d 744, 747 (6th Cir. 2005) (quoting *United States v. Carpenter,* 360 F.3d at 594). In *Laughton,* the affidavit at issue "failed to make any connection between the residence to be searched and the facts of criminal activity" alleged and further "failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred there." *Id.* The affidavit here indicates that Clay lived at the residence (with the complainant) and allegedly engaged in drug trafficking from the premises. Additionally, the application notes that the affiant, Quire, conducted the following independent investigation: "Research of the criminal history of Dono Demil Clay shows him to have been charged with Trafficking in a Controlled Substance in the First Degree in the past." Government's Hrg. Ex. No. 2.

The sufficiency of the present affidavit is a close call.[10] Although the affidavit does not identify Mitchell by name, it does connect her to the residence and does state specific information about Clay and alleged drug trafficking. She is simply a known (to officers) but unidentified (to the issuing judge) individual. Still, when, as here, a responsible adult resident of a home directly indicates that there is contraband located in the home, probable cause exists. Here, the domestic violence incident acted as a catalyst for access to information related to alleged "trafficking in controlled substances from the subject premises." Although the affidavit did not detail the history, it did contain reference to a locked portion of the apartment, the bedroom closet, which the complainant specifically associated with customary gun and cocaine storage. This reflects detailed knowledge of the apartment and alleged illegal activity at the location. This is not prima facie proof, but that is not here required. The complainant, as a current and long-term cohabitant at the apartment, identified the alleged trafficker and gave information from personal knowledge supporting reasonably the belief that the closet would hold contraband.[11] As a resident she had

---

**10.** The Court focuses its analysis on the non-identification of Mitchell but notes that officers curiously did not include any reference to the pipe or compact disc with white powdery residue they found in plain sight during the initial entry.

**11.** An eyewitness report of crime, if sufficiently credible, supports a finding of probable cause. *See, e.g., United States v. Elliott,* 893 F.2d 220, 223 (9th Cir.1990) (validating probable cause based on roommate's self-report of marijuana grow operation; roommate had lived at residence for significant period and gave information in person, not as "anonymous tipster"); *United States v. Craig,* 497 Fed.Appx. 328, 331 (4th Cir.2012) (endorsing reliance on statement from roommate, as probable cause element, that co-tenant "probably" had marijuana in his room—roommate made statement to police in person, making himself accountable for falsity).

daily reason to know the events occurring at the apartment. The target had at least some record of drug involvement, and the complainant was known to the police and thus had, as a matter of self-interest, reason to avoid supplying false information to police. The state judge did not act arbitrarily but rather on a substantial basis.[12]

 At oral argument, Defendant also cursorily raised staleness concerns, alleging that the affiant's use of the word "usually" does not implicate recent temporal scope. *See* Government's Hrg. Ex. No. 2 ("The complainant also advised that Clay *usually* keeps a firearm in the closet and cocaine in a top dresser.") (emphasis added). In evaluating whether information establishing probable cause is stale, courts consider the "inherent nature of the suspected crime and the objects sought." *United States v. Akram*, 165 F.3d 452, 456 (6th Cir.1999) (citations omitted). Generally, information related to drug crimes goes stale " 'very quickly' " because " 'drugs are usually sold and consumed in a prompt fashion.' " *United States v. Redmond*, 475 Fed.Appx. 603, 608 (6th Cir. 2012) (quoting *United States v. Brooks*, 594 F.3d 488, 494 n. 4 (6th Cir.2010)). However, " '[t]he passage of time is less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime.' " *Id.* (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir.2006)). Here, the affidavit establishes the residence, which had an internally secure storage closet, as a secure operational base and, although the word usually is nonspecific as it relates to time, it fairly implies ongoing activity given especially Mitchell's two-month tenure in the apartment. Further, the language from the affidavit, that

per the complainant Clay "was involved in" trafficking supports a perception of **current** events. Additionally, the Court notes that the affidavit also referenced a firearm, which is a durable, non-perishable good. *United States v. Lancaster*, 145 Fed.Appx. 508 (6th Cir.2005) (finding not stale information given by a confidential informant that a defendant had fired a firearm two years ago). The affidavit self-limits the temporal scope of probable cause, as it indicates that Clay and the complainant (Mitchell) had lived at the residence only since February 2013, or approximately 2 months. Given these circumstances, and acknowledging that neither party has briefed the underdeveloped issue, the Court finds that the information relevant to probable cause was not stale.

### D. Herring and Exclusion

As a final matter, in light of its recommended disposition, and further in light of the parties' silence on the issue, the Court does not alternatively decide whether exclusion would otherwise be appropriate if a violation occurred. The Sixth Circuit now recognizes the balancing test wrought by recent Supreme Court cases interpreting the rule. *United States v. Master*, 614 F.3d 236, 241–43 (6th Cir.2010); *United States v. Davis*, 690 F.3d 226, 251–53 (4th Cir.2012). In *Davis v. United States*, —— U.S. ——, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011), for example, the Supreme Court explained that "[t]he [exclusionary] rule's sole purpose ... is to deter future Fourth Amendment violations." Thus, according to the Court, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly ... unwarranted.' " *Id.* at 2426–27 (citing *United States v. Janis*, 428 U.S. 433, 96 S.Ct.

---

12. Contentions "with respect to bias and motive go beyond the four corners of the affidavit" and are not within the scope of review. *United States v. Woods*, 802 F.2d 460, *1 (6th

Cir.1986) (table) (per curiam) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

3021, 3032, 49 L.Ed.2d 1046 (1976)). The Court further explained that while "[r]eal deterrent value is a 'necessary condition for exclusion,' ... it is not 'a sufficient' one." *Id.* at 2427 (citing *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 2166, 165 L.Ed.2d 56 (2006)). The Court noted that exclusion exacts substantial social costs, as it "almost always requires courts to ignore reliable, trustworthy evidence.... And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (internal citation omitted). Accordingly, the Court held that "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* In doing so, the Supreme Court has "effectively created a balancing test" for determining whether evidence must be suppressed as a result of a Fourth Amendment violation. *Master*, 614 F.3d at 243; *United States v. Fugate*, 499 Fed.Appx. 514, 519 (6th Cir.2012). The parties here did not discuss these principles in the briefing or in any significant way at argument.

In considering the deterrent benefits of exclusion, the Supreme Court has directed lower courts to focus on the culpability of the law enforcement conduct at issue. *Davis*, 131 S.Ct. at 2427 (citing *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 701, 172 L.Ed.2d 496 (2009)). Where the police have acted with " 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (citing *Herring*, 129 S.Ct. at 702); *see also Herring*, 129 S.Ct. at 702 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

The District Judge will confront this issue if a constitutional violation occurred.

The Court must note that here, despite consent, police deferred closet entry pending warrant acquisition. Further, police included the Commonwealth Attorney in the warrant review process, securing his approval before submitting the papers to Judge Rhorer. The Judge issued the state search warrant simultaneously with a state assault 4th (domestic violence) warrant against Clay. It would be hard to ask much more of police. The search warrant may, like most, have been imperfect, but, given the chronology found, there is no indication in this record of deliberate misconduct on the part of the involved police officers.

## III. Recommendation

For the reasons stated above, the Court **RECOMMENDS** that the District Judge **DENY** Clay's motion to suppress (DE # 20).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. The parties should consult the aforementioned statute and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. Failure to object in accordance with the Rule waives a party's right to review.

Dec. 31, 2013.